1
2
3
4
5
6
7
8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ARTHUR R. ANDERSON,

11          Petitioner,              No. CIV 2:99-cv-1086 JAM JFM (HC)

12     vs.

13   CAL TERHUNE, et al.,

14          Respondents.            FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges on numerous grounds

18   his 1993 conviction on two counts of first degree murder and one count of attempted murder, all

19   accompanied by a true finding on a multiple murder special circumstance.[1]  This action is

20   proceeding on petitioner's first amended petition, filed May 5, 2004.[2]

21   _____

22          [1]  Petitioner was charged with capital murder.  Following his conviction, both sides
     waived jury trial for the penalty phase and the trial court sentenced petitioner to life in prison
23   without possibility of parole.

24          [2]  Petitioner's original petition contained twenty-six grounds for relief, several of which
     had multiple bases contained within the specified ground.  In the amended petition, petitioner has
25   withdrawn Claims 6, 9, 10, 14 through 18, 22, 23A, B, C, and E, and 26(3), (7), (9), (11), (12),
     (14)-(21), and has merged Claim 5 with Claim 19.  In these findings and recommendations, the
26   claims remaining in issue are identified by the number(s) and/or letter by which they are
     identified in the amended petition.

FACTS[3]

The prosecution evidence established that this is a case of murder among friends.  The murder victims, Stacy Nick and Robert Schmeisser, were friends of [petitioner] and [petitioner] described Schmeisser as his best friend.  There was also ample evidence that Nick and Schmeisser were dealers in cocaine, at least to some extent.  [Petitioner] was a user of cocaine and there was evidence that Schmeisser, and possibly Nick, had refused to provide him with cocaine on past occasions.

The crimes occurred on August 24, 1990.  At that time [petitioner] was living with his girlfriend, Joanne Pestana, on Orchard Woods Circle.  Nick lived across the street with his girlfriend, Lisa Pepin.  Schmeisser had been [petitioner]'s roommate on Orchard Woods Circle but had moved to an apartment complex on Valley Hi Drive where he lived with his girlfriend, Stephanie Becker.

[Petitioner]'s whereabouts in the early afternoon of August 24 are somewhat obscure.  He was employed as an electrician on a job in Fairfield and there was evidence he left the job site between 12:30 and 1:30 p.m. that afternoon.  At some time he went to Schmeisser's apartment and left electrical wire in the back of Schmeisser's truck.  When Pestana arrived home from work at around 4:40 or 4:45 p.m., [petitioner] was home taking a shower. When [petitioner] had finished showering and dressing he said, "So what, I am a drug addict," and walked out the door.  Pestana saw [petitioner] drive away in his Datsun 280-Z, and then immediately return and park across the street.  [Petitioner] got out of his car and walked toward Nick's house.  Michael Cole had been visiting Nick and was leaving just as [petitioner] arrived in his car.  He observed [petitioner] rummaging under his car seat. As Cole left he saw [petitioner] walking toward Nick's house carrying some sort of flat box.

Pestana assumed that [petitioner] went to Nick's house to buy drugs.  She decided that after [petitioner] left she would go over and confront Nick about providing drugs to [petitioner].  She went about her household chores until she saw [petitioner] drive away. Pestana then went to Nick's door, knocked, and entered.  She found Nick's body on the couch.  He had been fatally shot in the head.  During the autopsy a .357 Magnum caliber slug was

---

[3]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Anderson</u>, No. C015632 (Apr. 9, 1996), and this court's review of the Reporter's Transcript on Appeal (RT), Volumes Five through Seventeen.  A copy of the state court of appeal decision is attached as an appendix to petitioner's second petition for review to the California Supreme Court, which is included in this record as Exhibit C to Respondents' Answer to Petition for Writ of Habeas Corpus, filed March 2, 2000 (Answer).

recovered from Nick's head.  [Petitioner] owned a .357 Magnum handgun which he kept under the mattress on his bed.  Deputies investigating the Nick shooting asked Pestana to retrieve [petitioner]'s pistol but it was missing and has never been located.

Schmeisser was murdered shortly after Nick was shot.  It was established that the distance between Nick's home and Schmeisser's home was 1.8 miles and would take about five and one-half minutes to drive.  There was an eyewitness to the Schmeisser murder.  Michael Rhinehart, who lived in the same apartment complex as Schmeisser, testified that he got home from work around 4:15 or 4:20 p.m., and encountered Schmeisser working on his truck.  Rhinehart visited with Schmeisser and they eventually went into Schmeisser's apartment.

A person that Rhinehart identified as [petitioner][4] came to Schmeisser's door and was allowed to enter.  Schmeisser made introductions and Rhinehart thought he called the visitor Mark, but said it could have been Art.  Rhinehart observed that [petitioner] was carrying something, and that he went straight into the kitchen.  Schmeisser asked whether [petitioner] had come to get the wire out of his truck and [petitioner] said that he had.  [Petitioner] said there was something wrong with his .357 and Schmeisser began walking toward the kitchen.  [Petitioner] pulled a pistol as though he were going to hand it to Schmeisser, but then held it up to his face and shot him.

After shooting Schmeisser, [petitioner] shot at Rhinehart.  Fortunately, Rhinehart ducked to the floor and the shot missed.  When he realized he was not hit, Rhinehart got up and saw [petitioner] standing over Schmeisser.  As [petitioner] pointed the gun at him again, Rhinehart ran through the bedroom and locked himself in a bathroom.  He heard a door open and close but feared a ploy to get him to expose himself so he stayed in the bathroom.  After he heard the door open and close a second time, he grabbed a telephone from the bedroom and retreated to the bathroom once again.  He called 911 and remained in the bathroom until the police arrived.  Rhinehart's 911 call was logged at 5:41 p.m.

A bullet slug was recovered from Schmeisser's head during the autopsy and another was recovered from the wall of his apartment.  The condition of the bullets precluded conclusive ballistic identification, but the slugs were consistent with the slugs recovered from Nick's body.  All of the slugs were identified as

---

[4]  Rhinehart identified [petitioner] from a photographic lineup and at the preliminary hearing.  He testified that he was absolutely sure of his photographic identification and was very sure of his preliminary hearing identification of [petitioner].  He did not identify [petitioner] at trial.  However, numerous witnesses commented on significant changes in [petitioner]'s appearance between the events in question and the trial over two years later.

1  being associated with Winchester silver-tipped, hollow-point, .357
   Magnum caliber bullets.

2
        [Petitioner] was arrested later that night after wrecking his car
3  on Eschinger Road, a rural road a few miles south of the scene of
   the murders.  A local resident reported that around 6 p.m. he
4  encountered someone in a 280-Z on Eschinger Road near a gate
   that marked the entrance to a ranch owned by Fred Holthouse.  The
5  car was blocking the road and he had to wait for it to be moved.
   Later, about 11 p.m., [petitioner] approached the home of Howard
6  Wackman, said he had been in a car wreck, and asked to use the
   telephone.  He had blood on his face and a bump and red mark on
7  his head.  Deputies called to the scene discovered that [petitioner]
   had wrecked his car by running into fence posts on both sides of
8  the road and eventually crashing through the fence and into a cow
   pasture on the Holthouse property.  [Petitioner] was taken into
9  custody at that time.

10  People v. Anderson, slip op. at 2-6.  Petitioner's defense consisted principally of alibi evidence

11  and evidence offered to suggest that one or more third parties were culpable for the murders.

12  Petitioner called numerous defense witnesses and he testified in his own defense.

13                                    ANALYSIS

14  I.  I.  Standards for a Writ of Habeas Corpus

15          Federal habeas corpus relief is not available for any claim decided on the merits in

16  state court proceedings unless the state court's adjudication of the claim:

17          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
18          determined by the Supreme Court of the United States; or

19          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
20          State court proceeding.

21  28 U.S.C. § 2254(d).

22          Under section 2254(d)(1), a state court decision is "contrary to" clearly

23  established United States Supreme Court precedents if it applies a rule that contradicts the

24  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

25  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

26  /////

                                        4

1  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406
2  (2000)).

3          Under the  "unreasonable application" clause of section 2254(d)(1), a federal
4  habeas court may grant the writ if the state court identifies the correct governing legal principle
5  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the
6  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ
7  simply because that court concludes in its independent judgment that the relevant state-court
8  decision applied clearly established federal law erroneously or incorrectly.  Rather, that
9  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,
10 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent
11 review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

12         The court looks to the last reasoned state court decision as the basis for the state
13 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court
14 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal
15 habeas court independently reviews the record to determine whether habeas corpus relief is
16 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

17 II.  Petitioner's Claims[5]

18         Claim 1:  Juror Misconduct – Extrinsic Evidence

19         Petitioner's first claim is that several of his constitutional rights[6] were violated

20 _____

21         [5]  Respondents contend that two of petitioner's claims arising from allegations that a juror
   slept through portions of the trial are barred by the doctrine of procedural default.  For the
22 reasons set forth herein, the claims are without merit.  The court will not reach the procedural
   default defense raised as to those claims.

23         [6]  Petitioner claims violations of his "rights to confrontation, counsel, cross-examination,
   due process, to present a defense, fair trial, to be present during the presentation of evidence,
24 impartial jury, and to be judged solely on the evidence properly received at trial as guaranteed by
   the Fifth, Sixth and Fourteenth Amendments."  Amended Petition, filed May 5, 2004, at 22.
25 Respondents contend that the claimed violations of petitioner rights to counsel, to present a
   defense, to be present during presentation of evidence, and to be judged solely on the evidence
26 properly received at trial are procedurally defaulted because those claims were presented for the

when a juror consulted an almanac to determine what the weather had been on the afternoon of

August 24, 1990 and reported to the jury that the temperature had reached 78 degrees and the

entire day had been overcast.  This claim was raised in and rejected by the state courts on

petitioner's direct appeal.  Exs. C and D to Answer.  The last reasoned rejection of this claim is

the decision of the state court of appeal, which found that the juror had committed misconduct,

but rejected the claim on the ground that there was not "a substantial likelihood that the vote of

one or more jurors was influenced by the extraneous matter called to their attention."  People v.

Anderson, slip op. at 26-27.

        The state court of appeal set forth the relevant facts and its disposition of this

claim as follows:

            The factual basis for this [claim] was established through the
        declaration of Juror Harney, who declared:  "That during
        deliberations, we discussed Jerry Gould's testimony.  During the
        discussion of Jerry Gould's testimony, one of the jurors, told other
        jurors, that he had looked up in the Almanac, the weather
        conditions for the day of the murders.  He informed the other jurors
        that it was 78 degrees and overcast."

            The trial court found the incident to constitute juror misconduct
        but denied the motion for a new trial on that ground.  The court

---

first time in petitioner's petition for review to the California Supreme Court, in violation of Rule
28(c) of the California Rules of Court, which respondents contend "provides that, as a matter of
policy, on petition for review the California Supreme Court will not consider any issue that could
have been but was not timely raised in the briefs filed in the California Court of Appeal or any
issue of material fact that was omitted from or misstated in the opinion of the California Court of
Appeal."  Aug. 3, 2004 Answer at 32.  Respondents also contend that this alleged procedural
default means that these claims are unexhausted.  Respondents also note that the California
Supreme Court's denial of petitioner's petition for review contains no statement of reasons for
the decision; respondents urge the court to "assume" that the California Supreme Court relied on
Rule 28(c) in rejecting these claims.  In order for a claim to be barred by the doctrine of
procedural default, a state court decision rejecting the claim must be based on a state law ground
that is independent of federal law and adequate to support the judgment.  Coleman v. Thompson,
501 U.S. 722 (1991); Harris v. Reed, 489 U.S. 255, 260-62 (1989).  Procedural default cannot be
based on "an ambiguous order that did not clearly rest on independent and adequate state
grounds"; the reliance on independent and adequate state law grounds for rejection of particular
claims must be clear from the state court's decision.  See Siripongs v. Calderon, 35 F.3d 1308,
1317-1318 (9th Cir. 1994).  The state supreme court's silent denial is not sufficient to support a
finding of procedural default.  A fortiori, respondents' contention that these claims are
unexhausted is also without merit.

said that it could not find any significant likelihood that the misconduct would have affected the jurors' decisions. The court indicated an awareness that the standard is objective, that is, whether there is any likelihood that a juror would be affected, and said, "I can't see it here."

It is misconduct for a juror to receive information out of court. (*People v. Holloway* (1990) 50 Cal.3d 1098, 1108.) And it is settled that such misconduct raises a presumption of prejudice that requires a new trial unless rebutted by proof that no prejudice resulted. (*Ibid.*) The analysis of prejudice to be followed has been set forth by the California Supreme Court in *People v. Marshall* (1990) 50 Cal.3d 907, at pages 950 and 951, which we restate in clarified form [footnote omitted] here. A judgment adverse to a defendant in a criminal case must be reversed or vacated whenever the court finds a substantial likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury. The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror. Such "prejudice analysis" is different from, and indeed less tolerant than, "harmless-error analysis" for ordinary error at trial. When the misconduct in question supports a finding that there is a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment, we are compelled to conclude that the integrity of the trial was undermined; under such circumstances, we cannot conclude that the jury was impartial. By contrast, when the misconduct does not support such a finding, we must hold it nonprejudicial. (See also *People v. Holloway*, *supra*, 50 Cal.3d at pp. 1108-1109.)

In determining whether there is a substantial likelihood that the vote of one or more jurors was influenced by the extraneous matter called to their attention, we must consider the misconduct in light of the entire record. (*People v. Zapien* (1993) 4 Cal.4th 929, 994.) Upon consideration of the entire record in this case, we agree with the trial court that, as an objective matter, there is not a substantial likelihood here.

The information about weather conditions was mentioned with respect to the testimony of Jerrie Gould. Gould's testimony was quite brief, her direct testimony consuming less than four pages in the reporter's transcript, and was offered as some corroboration for the testimony of Betty Gipson, her mother-in-law. Gould testified that on the afternoon of August 24, 1990, she saw [petitioner] at Gipson's house. She was not sure of the exact time but said it was somewhere around 4 to 6 p.m. When pressed for a more specific time she said: "I don't know the time. I don't have a specific time.

7

I really don't." At the time of the murders, Gould was living in Milpitas and would visit Gipson on weekends. She would have left Milpitas around 12 or 1 p.m., and it would take her about two hours to get to Gipson's house. At the time she saw [petitioner] there she was washing her car. She added that she always waits until later in the day to wash her car so it is not so hot and water spots do not get on the car. She had no specific recollection of the day in question but was only going by her usual custom. Gould was not asked about the day in question until over two years later and her memory was extremely vague with respect to virtually all details.

Betty Gipson testified that [petitioner] was supposed to do some free lance electrical work for her on the day after the murders, a Saturday, and that he came to pick up an advance check on Friday. She said that as close as she could estimate, he arrived between 5 and 5:30 p.m., and stayed for 15 to 20 minutes. She did not look at a clock at the time, was not asked about that day until more than two years later, and was drawing upon her best recollection. When she was initially interviewed she said that her recollection was based on the fact that [petitioner] told her he would pick up the check after he got off work and that he was working out of town, about an hour away. At trial she conceded that had been a factor in her original thinking, but maintained that regardless of that factor her recollection of [petitioner]'s arrival remained at between 5:00 and 5:30.[7] When asked about Gould, Gipson said that Gould had arrived in the afternoon and was washing her car while [petitioner] was there. At trial Gipson agreed that it was Gould's habit to wash her car in the late afternoon. However, in her prior interviews Gipson had not mentioned that matter and testified that she did not regard it as important.

In light of the entire record, including [petitioner]'s testimony, Gipson's testimony was not an alibi with respect to the Nick murder. We have previously noted the testimony of [petitioner]'s live-in girlfriend, Joanne Pestana. She testified that she got off work at 4, picked up her child, and arrived home between 4:40 and 4:45 on the afternoon of the murder. [Petitioner] was home and was showering when she arrived home. When [petitioner] finished showering and dressing he left in his car and then immediately returned and stopped at Nick's house. Pestana waited for [petitioner] to leave so she could confront Nick, and in the meantime returned a telephone call to her insurance agent. When [petitioner] left, Pestana went over to Nick's house and found him fatally wounded. Pestana's employer confirmed that she got off

---

[7] The 5 to 5:30 arrival time at Gipson's house would be consistent with an after-work visit if [petitioner] had worked until around 4, as Gipson assumed. However, the evidence established that [petitioner] left work immediately after lunch on that day, sometime between 12:30 and 1:30.

work at 4 on the day of the murders, her telephone records confirmed a call to her insurance agent at 5:01 p.m., and her call to police after finding Nick was made at 5:21.

In his testimony [petitioner] admitted that he was in the shower when Pestana arrived home and that he left when he finished showering. He stopped to check his mailbox across the street, and may have made a U-turn in order to do so. He said he may have approached and knocked on Nick's door, but he maintained that he did not see Nick at that time. In light of this evidence, Gipson's testimony was not inconsistent with [petitioner]'s opportunity to have committed the Nick murder. However, [petitioner] claimed that after driving away from Nick's house he went to Gipson's house to pick up a check, and thus to have lacked an opportunity to have committed the Schmeisser murder. In this respect [petitioner]'s testimony was impeached by evidence of his interview with detectives after the murders in which he said that at the time of the murders he was at a Lumberjack store, the bank, and cruising the interstate, but made no mention of going to Gipson's house.

The whole record gives rise to an inference that the same culprit committed both murders. [Petitioner]'s own testimony foreclosed Gipson's testimony as an alibi for the Nick murder and although Pestana did not actually witness the shooting, her testimony and other factors present a strong circumstantial case of [petitioner]'s commission of that crime. [Petitioner] was identified as the perpetrator by the eyewitness to the Schmeisser murder, which was committed only a short time after the Nick murder.

On this record the primary value of the Gipson evidence was to provide an alibi for the Schmeisser murder and, in view of the likelihood that the murders were committed by the same person, to support [petitioner]'s claim that he did not actually see Nick at the time Pestana reported he had gone to his house. In view of this record we agree with the trial court that the weather information was utterly tangential and collateral. When asked, Gipson agreed that Gould would normally wash her car in the late afternoon, but Gipson did not purport to rely upon that fact or upon a recollection of the weather for her estimate of the time of [petitioner]'s visit. Gould's testimony had value only to corroborate Gipson's testimony that [petitioner] visited on the afternoon of the murders. Her testimony was too vague and uncertain, and her estimate of the time was too broad and indefinite to provide alibi evidence in itself. Moreover, Gould did not purport to remember or rely upon the actual weather on the day of the murders in forming her estimate of the time of [petitioner]'s visit. And, as the trial court noted, information that the day was 78 degrees and overcast would not specifically contradict either Gould or Gipson's testimony.

People v. Anderson, slip op. at 25-31.

9

Several principles of federal law govern this claim.  It is well-established that

> [j]ury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment.  Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir.1988).  Not every constitutional error, however, is grounds for reversal.  On collateral review, we must determine whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 627, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).  Errors that do not have a "substantial and injurious effect" on the trial's outcome are deemed harmless.  Bonin v. Calderon, 59 F.3d 815, 824 (9th Cir.1995).

Eslaminia v. White, 136 F.3d 1234, 1237 (9th Cir. 1998).  Several factors are relevant to the question of whether receipt of extraneous information had a "substantial and injurious effect" on the jury's verdict:

> "(1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached and, if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict."

Sassounian v. Roe, 230 F.3d 1097, 1109 (9th Cir. 2000) (quoting Dickson, 849 F.2d at 406 (in turn quoting Marino v. Vasquez, 812 F.2d 499, 506 (9th Cir. 1987).  In addition, there are "other factors that 'might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case.'"  Sassounian, at 1109 (quoting Jeffries v. Blodgett, 114 F.3d 1484, 1491 (9th Cir. 1997).  "These include:

> [1] whether the prejudicial statement was ambiguously phrased; [2] whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; [3] whether a curative instruction was given or some other step taken to ameliorate the prejudice; [4] the trial context; and [5] whether the statement was insufficiently prejudicial given the issues and evidence in the case."

Sassounian, at 1109 (quoting Jeffries at 1491-92); see also Mancuso v. Olivarez, 292 F.3d 939, 952 (9th Cir. 2002) (discussing foregoing factors as incorporated in the fifth Dickson factor

requiring consideration of "any other matters which bear on the issue of the reasonable possibility of whether extrinsic material affected the verdict.")  In reviewing this claim, the court may properly consider "juror testimony about the consideration of extrinsic evidence" but "juror testimony about the subjective effective of evidence on the particular juror" is not admissible. Sassounian, at 1108.

The record shows that at the start of the afternoon session on December 29, 1992, during Betty Gipson's testimony, Juror Garcia raised a question with the court that led to the following colloquy:

> THE COURT:  . . . I was told that one of the jurors asked the court attendant a question.  I think it might have been Mr. Garcia.  I think, as I understand the question, "Can the jurors ask questions of witnesses?";  is that your question?
>
> JUROR GARCIA:  Not necessarily.
>
> THE COURT:  All right.  Go ahead.
>
> What is your question?
>
> JUROR GARCIA:  There is a lot of testimony dealing with the sunset.  I was wondering if there was an Almanac to find out actually when the sun did set on that day.
>
> THE COURT:  Okay.  Questions of that kind are asked from time to time by jurors, and I understand why you are asking the question.
>
> The response is that in our system of justice the jurors have to be passive finders of the fact.  You just have to take the evidence as it's presented by the attorneys, and take into account the burden of proof or burdens of proof and decide, as best you can, the evidence as it's presented to you.
>
> So the answer is, I can't – I can't answer it.  Undoubtedly there is an Almanac.  There is nothing in evidence about it at the present time, maybe something can be proven about when the sun set or whatever.

RT at 3314-15.  Near the conclusion of the presentation of evidence, the parties stipulated that "according to the United States Naval Observatory, sunset and sunrise in Sacramento on August 24, 1990 would have been . . . 6:28 a.m., and sunset would be 7:48 p.m." RT at 4223.  In

addition, Detective Edwards testified that the weather on August 24 and 25 was sunny. RT at

2932. At the end of trial, the jury was instructed that it "must determine the facts of the case

from the evidence received in the trial and not from any other source" and that "[a] 'fact' is

something proved directly or circumstantially by the evidence or by stipulation." CT at 507.

The jury was also instructed that it

> must decide all questions of fact in the case from the evidence
> received in the trial and not from any other source.
>
>    You must not make any independent investigation of the facts
> or the law or consider or discuss facts as to which there is no
> evidence. For example, you must not on your own visit the scene,
> conduct experiments, or consult reference works or persons for
> additional information.

CT at 515; RT at 4415.

    After trial, petitioner moved for a new trial based on the ground that, <u>inter alia</u>,

during deliberations while the jurors were discussing Jerrie Gould's testimony one of the jurors

advised the other jurors that he had consulted an almanac and learned that the weather was 78

degrees and overcast on August 24, 1990. CT at 622, 635. This part of petitioner's motion was

supported by a declaration by juror Betty Harney. <u>Id.</u> at 622, 635. Petitioner has presented a

second declaration by Juror Harney, which includes two paragraphs that relate to this claim. <u>See</u>

Declaration of Betty Harney, filed Oct. 2, 2002, at ¶¶ 9-10 (hereafter Second Harney

Declaration). Those two paragraphs are as follows:

> 9. During deliberations I and other members of the jury were
> concerned with the accuracy of Ms. Jerry Gould's testimony, and
> jurors discussed how important it was for us to decide if she was
> correct in her time estimate of when she saw the defendant at her
> mother-in-law's house.
>
> 10. On perhaps the second day of deliberations, a male juror
> advised all the other jurors that he had looked up the weather for
> the day in question in the Almanac, and that the it [sic] was 78
> degrees and overcast that day. We debated how that weather
> condition affected the validity of Gould's time estimate of when
> she saw Anderson, since it was based on what time of day she
> usually washes her car to avoid spots from the sun. I understood

1    that I was not allowed to consider this weather information, but it
     did raised [sic] a little doubt in my mind that Gould could be
2    wrong, since she could have washed her car any time on an
     overcast day.  The question of reconciling the testimonies of Ms.
3    Gould and Mrs. Gipson was not a minor issue; it was a difficult
     point for me, and was debated with strong views on all sides by the
4    jurors.

5    Second Harney Declaration at ¶¶ 9-10.  Most of the statements in these paragraphs cannot be

6    considered by this court because they "describe the deliberative process or subjective effects of

7    extraneous information."  Sassounian, at 1108 (citing United States v. Bagnariol, 665 F.2d 877,

8    884-85 (9th Cir. 1981)); see Fed. R. Evid. 606(b).  However, Juror Harney's statements that

9    "[o]n perhaps the second day of deliberations, a male juror advised all the other jurors that he had

10   looked up the weather for the day in question in the Almanac, and that the it [sic] was 78 degrees

11   and overcast that day," and that the jury "debated how that weather condition affected the validity

12   of Gould's time estimate of when she saw Anderson, since it was based on what time of day she

13   usually washes her car to avoid spots from the sun" are admissible and properly considered.[8]

14          There is no dispute that it was misconduct for the juror to look up weather

15   information in an almanac and to bring that information to the attention of other jurors.  The

16   issue is whether that misconduct was prejudicial and, in turn, whether the state court's decision

17   that it was not is contrary to or an unreasonable application of relevant principles of clearly

18   established federal law, or based on an unreasonable determination of the facts.

19          The juror provided two separate pieces of information about the weather on

20   August 24, 1990, as gleaned from an almanac:  that the day was overcast, and that it was 78

21   degrees.  Juror Harney's declaration suggests that the information was actually received by the

22   entire jury, and that it was received on the second day of deliberations.  The Clerk's Transcript

23   shows that the jury deliberated for just over seven court days, requested several readbacks of

24

25          [8]  It is less clear that Juror Harney's statement that she "understood that [she] was not
     allowed to consider this weather information" is admissible, though it does suggest that at least
26   Juror Harney understood the trial court's instructions in that regard.

13

1   testimony, none of which included Jerrie Gould or Betty Gipson's testimony, and asked the court

2   to "tell us more about reasonable doubt.  What does it really mean?"  CT at 563-583.  The

3   weather information was provided near the start of deliberations, which continued for at least five

4   days thereafter before a verdict was reached.  Cf. Sassounian, at 1110 (timing of discussion of

5   improper information deemed "critical" where jury discussed improper information after fifteen

6   days of deliberation and after asking judge what to do if it could not agree, and reached verdict

7   one hour later).  While Juror Harney's declaration suggests that the jury discussed the

8   information, it sheds no light on how much time was spent on those discussions.  Thus, the court

9   examines the factors considered to determine whether there were "any other matters which may

10  bear on whether the introduction of extrinsic material substantially and injuriously affected the

11  verdict."  Mancuso v. Olivarez, 292 F.3d 939, 952 (9th Cir. 2002).

12          The information that the day was overcast contradicted Detective Edwards'

13  testimony that the day was sunny and was not cumulative of any evidence offered at trial.  Both

14  the trial judge's response to Juror Garcia's question and the specific jury instruction given as part

15  of the overall charge to the jury informed the jury that it could not consider such extraneous

16  information, but no curative instruction was given after the almanac information was provided.

17  The state court's decision rejecting this claim was based, essentially, on its conclusion that the

18  evidence was "'insufficiently prejudicial in light of all the other issues and evidence in the case,'"

19  Sassounian, at 1109 (quoting Jeffries, at 1492), the final inquiry in the determination of matters

20  that bear on prejudice.  The state court's conclusions in this regard are not based on an

21  unreasonable determination of the facts.

22          In order to obtain relief in these federal habeas corpus proceedings, the state

23  court's decision "must be more than incorrect or erroneous. . . . [It's] application of clearly

24  established law must be objectively unreasonable."  Lockyer v. Andrade, 538 U.S. at 75.  After

25  review of the record and the factors relevant to a determination of whether the juror misconduct

26  was prejudicial, this court cannot find that the state court's determination that the misconduct

14

1    was not prejudicial is unreasonable.  For that reason, petitioner's first claim for relief must be

2    denied.

3          Claim 2:  <u>Erroneous Jury Instruction</u>

4               Petitioner's second claim for relief is that his right to due process was violated by

5    the instruction provided to the jury on murder by lying in wait.  The trial court instructed the jury

6    with a slightly amended version of CALJIC 8.25, as follows:

7          Murder which is immediately preceded by lying in wait is murder
           of the first degree.  "Lying in wait" is defined as waiting and
8          watching for an opportune time to act, together with a concealment
           by ambush or some other secret design to take the other person by
9          surprise [even though the victim is aware of the murderer's
           presence].  The lying in wait need not continue for any particular
10         period of time provided its duration is such as to show a state of
           mind equivalent to premeditation and deliberation.

11

12   RT at 4432-4433.[9]  At all times relevant to this action, California law included in the definition

13   of first degree murder any "murder which is perpetrated by means of . . . lying in wait."  Cal.

14   Penal Code § 189.  Petitioner contends that the phrase "by means of" denotes a causal connection

15   between lying in wait and murder, that this nexus is an essential element of lying in wait murder,

16   and that omission of this language from CALJIC 8.25 and, instead, use of the phrase

17   "immediately preceded by lying in wait," relieved the prosecution of its obligation to prove this

18   essential element in violation of petitioner's rights under the federal due process clause.

19   Amended Petition at 26; Traverse to Amended Petition filed Nov. 4, 2004 (Traverse) at 19-20.

20               This claim was raised in and rejected by the state courts on petitioner's direct

21   appeal.  Exs. C and D to Answer.  The last reasoned rejection of this claim is the decision of the

22   state court of appeal, which rejected the claim on the ground that the challenged jury instruction

23

24        [9]  The trial court initially read the last sentence as follows:  "The lying in wait need not
     continue for particular period of time provided that its duration is such as to show a state of mind
     equivalent to premeditation or deliberation."  RT at 4432.  After a sidebar conference, the court
25   re-read the last sentence and changed the last phrase to "premeditation and deliberation."  <u>Id</u>. at
     4433.  In CALJIC 8.25, the last sentence is phrased in the disjunctive rather than in the
26   conjunctive.  <u>See</u> <u>People v. Anderson</u>, slip op. at 63 n.16.

1  had been approved by the California Supreme Court and the appellate court "was not at liberty to

2  reject the holding of our Supreme Court."  People v. Anderson, slip op. at 63.

3           On federal habeas corpus review, this court is bound by the decision of the state

4  courts on questions of state law.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  The definition

5  of the elements of a state criminal offense is a question of state law.  See Jackson v. Virginia, 443

6  U.S. 307, 324 n.16 (1979); see also Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998).

7           Under California law, first degree murder is the unlawful killing of a human being

8  in a willful, deliberate, and premeditated manner.  See People v. Anderson, 70 Cal.2d 15, 24

9  (1968).  California Penal Code § 189 provides in relevant part that "[a]ll murder which is

10  perpetrated by means of ... poison, lying in wait, torture, or by any other kind of willful,

11  deliberate, and premeditated killing, ... is murder of the first degree...."[10]  Under this section of

12  the California Penal Code, lying in wait is "a substitute for premeditation and deliberation when

13  determining whether a murder is a first-degree murder.  That is, . . . , if a person lies in wait to

14  kill another, California treats him as having the equivalent of premeditation and deliberation."

15  Morales v. Woodford, 388 F.3d 1159, 1177 (9th Cir. 2004).

16           [T]he theory of first degree murder by means of lying in wait does
             not require the intent to murder the victim, but rather, "the intent to
17           watch and wait for the purpose of gaining advantage and taking the
             victim unawares in order to facilitate the act which constitutes
18           murder." People v. Laws, 12 Cal.App.4th 786, 15 Cal.Rptr.2d 668,
             674 (1993). Moreover, the lying in wait need not continue for any
19           particular period of time, provided that its duration is such as to
             show a state of mind equivalent to premeditation or deliberation.
20           People v. Ruiz, 44 Cal.3d 589, 244 Cal.Rptr. 200, 212, 749 P.2d
             854, 867, cert. denied, 488 U.S. 871, 109 S.Ct. 186, 102 L.Ed.2d
21           155 (1988); Laws, 12 Cal.App.4th at 795, 15 Cal.Rptr.2d at 675.

22  Calderon v. Prunty, 59 F.3d 1005, 1008-09 (9th Cir. 1995).  In other words, under California law,

23  evidence of lying in wait is one way that the mens rea requirement of first degree murder can be

24

25           [10]  At least one California court of appeal has noted that the statutory requirement that
      murder be "perpetrated by means of" lying in wait is "perhaps imperfectly phrased since lying in
26      wait, unlike torture or poison, cannot itself cause death."  People v. Berberena, 209 Cal.App.3d
      1099, 1103 n.2 (Cal.App. 1 Dist. 1989).

1  proved.  Given the foregoing principles of state law, the use of CALJIC 8.25 at petitioner's trial

2  did not unconstitutionally shift the prosecution's burden of proof on any element of the charges

3  again petitioner.  The state courts' rejection of this claim was neither contrary to, nor an

4  unreasonable application of, controlling principles of federal law.  This claim should be denied.

5        Claim 3:  <u>Juror Misconduct</u>

6        By his third claim for relief, petitioner contends that his constitutional rights to

7  due process, a fair trial, and an impartial jury were violated by two separate instances of juror

8  misconduct.  In the first part of claim 3, petitioner contends that his constitutional rights were

9  violated by a juror who formed and expressed an opinion concerning petitioner's guilt early in

10 the trial proceedings.  In the second part of claim 3, petitioner contends that his constitutional

11 rights were violated when jurors concealed during voir dire personal experiences with cocaine

12 use and when the jurors discussed during deliberations personal knowledge of the effects of

13 cocaine.

14              Claim 3A:  <u>Prejudgment of Guilt</u>

15       By claim 3A, petitioner contends that his constitutional rights to due process, a

16 fair trial, and an impartial jury were violated by the misconduct of Juror Vohland, who allegedly

17 formed and expressed an opinion of petitioner's guilt early in the trial proceedings.  This claim

18 was raised in and rejected by the state courts on petitioner's direct appeal.  Exs. C and D to

19 Answer.  The last reasoned rejection of this claim is the decision of the state court of appeal,

20 which set forth the relevant facts as follows:

21      The [trial] court conducted an evidentiary hearing with respect
   to the alleged misconduct of Vohland.  [Citation omitted.]  At that

22      hearing Susan Turek, who was an alternate juror in the case,
   testified that early in the trial, during the testimony of Joanne

23      Pestana, Vohland made a statement to her.  They were sitting at a
   table in the cafeteria when Vohland leaned forward and stated that

24      '[i]t was a shame of what we had to go through since they already
   had an eyewitness to the murder."  The statement made Turek

25

26

extremely uncomfortable and she got up and left.[11]  She did not report the incident at the time because it had no impact upon her view of the case and she concluded it was not a violation of the laws of the court.

Vohland testified that he recognized Turek but did not recall having a discussion with her in the cafeteria.  He denied making the statement attributed to him by Turek, and said that he could not imagine making such a statement because he did not feel that way. He said that he kept an open mind throughout the trial and that his concern for making a correct decision bothered him so much that during the trial he would wake up prematurely, half ill with worry, because he did want to make a mistake.  He said that he understood and agreed with the presumption of innocence and added that he would have loved to find for the [petitioner].  [Footnote omitted.]

In ruling on the motion for a new trial the trial court said that with respect to the question whether a statement was made, it found Turek to be the more credible witness.  Although the court did not believe Turek remembered the exact words, it found that Vohland made a statement similar to that reported by Turek.  The court found the statement to have been misconduct.  However, the court denied the motion for a new trial on that ground.  It found the statement to have been equivocal or ambiguous.  It did not manifest that Vohland had firmly arrived at a fixed decision about guilt.  The court accepted Vohland's denials that he had done so and his statements that he had agonized over the case, and the court did not believe that he had made up his mind in any kind of firm way at that particular point.

People v. Anderson, slip op. at 31-33.

The state court of appeal rejected petitioner's claim that his constitutional rights were violated because Juror Vohland's statement showed that he had prejudged the case, as follows:

We agree with the trial court that the isolated statement attributed to Vohland is not a statement of such character that it constitutes incontrovertible evidence that he did [prejudge the case].  In ruling on the new trial motion the trial court had the

---

[11]  There was no conversation between Turek and Vohland and there were no other statements by Vohland.  Thus, the statement attributed to Vohland was isolated and lacking in context or development to give it meaning.  The trial court permitted Turek to testify to her impressions for the limited purpose of explaining her subsequent conduct.  She felt that Vohland was indicating that if there was an eyewitness to the murder the individual was guilty, and that he had the impression that Pestana was an eyewitness.  Turek's impressions were properly excluded for the purpose of establishing what Vohland meant.

1    opportunity to consider its observations of Vohland throughout the
     trial and during his testimony on the motion for a new trial and we
2    will defer to the trial court's observations and credibility
     determinations as long as they are supported by substantial
3    evidence.  [Citations omitted.]  Vohland's testimony, which was
     accepted by the trial court, is sufficient to establish that he did not
4    prejudge the case and thus to rebut the presumption of prejudice
     arising from this incident.

5

6    Id. at 35.

7           "The Sixth Amendment guarantees criminal defendants a verdict by impartial,

8    indifferent jurors."  Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998).  "[T]he presence of a

9    biased juror introduces a structural defect not subject to harmless error analysis."  Id. at 973 n.2

10   (citing Arizona v. Fulminante, 499 U.S. 279, 307-10 (1991)).[12]  "The determination of whether a

11   juror is actually biased is a question of fact."  Fields, at 1193 (citing Dyer, at 973).  Where, as

12   here, petitioner is proceeding exclusively on the record before the state courts the challenge to

13   this factual question is "reviewed under § 2254(d)(2); the question on review is whether an

14   appellate panel, applying the normal standards of appellate review, could reasonably conclude

15   that the finding is supported by the record."  Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir.

16   2004).

17          After review of the record, this court finds that the state court's factual findings

18   that Juror Vohland's statement was "equivocal or ambiguous" and that Juror Vohland did not

19   prejudge the case are supported by the record, as is the state courts' conclusion that Juror

20   /////

21

22          [12]  Juror bias may be analyzed "under two theories, actual bias and implied bias."  Fields
     v. Brown, 431 F.3d 1186, 1193 (9th Cir. 2005).  "Actual bias is '"bias in fact"-the existence of a
23   state of mind that leads to an inference that the person will not act with entire impartiality."
     United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir.2000) (quoting United States v. Torres,
24   128 F.3d 38, 43 (2d Cir.1997))."  Id. at 1194.  Implied bias, on the other hand, is bias "implied in
     'those extreme situations where the relationship between a . . . juror and some aspect of the
25   litigation is such that it is highly unlikely that the average person could remain impartial in his
     deliberations under the circumstances.'"  Fields, at 1194 (quoting Fields v. Woodford, 309 F.3d
26   1095, 1105 (9th Cir. 2002)).  The claim at bar presents a question of actual bias.

1  Vohland  was not actually biased.[13]  Put another way, the court finds that an appellate panel,

2  applying normal standards of appellate review, could reasonably conclude that the foregoing

3  findings are supported by the record.  See Lambert, id.  The state courts' factual finding that

4  Juror Vohland was not actually biased is therefore presumed correct.  Given the fact, supported

5  by the record, that Juror Vohland was not actually biased, petitioner's Sixth Amendment claim

6  should be denied.

7                      Claim 3B:  False Denials of Cocaine Use

8                      Petitioner also claims that his rights to due process, a fair trial and an unbiased

9  jury were violated when jurors failed to disclose, during voir dire, personal experience with drug

10  use and when jurors discussed, during deliberations, personal knowledge of the effects of

11  cocaine.[14]  This claim was raised in and rejected by the state courts on petitioner's direct appeal.

12  Exs. C and D to Answer.  The last reasoned rejection of this claim is the decision of the state

13  court of appeal, which set forth the facts relevant to this claim as follows:

14                      During voir dire the court questioned prospective jurors about
                        whether they had ever been personally affected by cocaine abuse,
15                      by which the court explained that it meant "have you had a
                        problem with cocaine abuse or has someone close to you had a

16

17          [13]  Petitioner's statement in the traverse that "[t]he trial judge here never found that
    Vohland was credible in any of his testimony" is contradicted by the record.  In ruling, the trial
18  judge specifically stated that he "found no reason to disbelieve [Vohland] if he said that he
    agonized over the case.  He said that he, although he admitted going into the jury room with a
19  predisposition, he said that he – his great hope was to find a way to find Mr. Anderson not guilty.
    I don't see any reason to disbelieve that."  RT at 5236.
20
            [14]  Petitioner also claims that his right to exercise peremptory challenges was violated by
21  the events related to this claim.  Respondents contend that petitioner has failed to exhaust this
    aspect of the claim and that it is procedurally defaulted because it is now time-barred under
22  California law.  Petitioner contends that he exhausted the claim by raising it on direct appeal and
    in his second petition for review to the California Supreme Court.  Contrary to petitioner's
23  assertion, Claim III(B) of his second petition for review does not expressly include a contention
    that the relevant events violated a right to exercise peremptory challenges.  See Ex. C to Answer,
24  at i and 13.  In any event, the United States Supreme Court has held that "there is nothing in the
    Constitution of the United States that requires the Congress to grant peremptory challenges to
25  defendants in criminal cases; trial by an impartial jury is all that is secured."  Stilson v. U.S., 250
    U.S. 583, 586 (1919).  See also Ross v. Oklahoma, 487 U.S. 81, 88 (1988).  There is no separate
26  constitutional right to exercise peremptory challenges.

problem with cocaine abuse, so that it has affected your life, a child, a friend, a spouse, a boyfriend, a girlfriend?" Ten of the jurors who ultimately decided the case answered negatively.

In response to the trial court's questioning, two of the jurors who ultimately sat on the case gave answers that led to further inquiry. Juror Garcia said that he did not use drugs but had been personally affected by friends and people he knew who used drugs. He explained that he grew up in a bad neighborhood and after high school many of his friends and acquaintances began using drugs. Some of them were killed in crimes of violence and others died of overdoses. He said that he would know when his friends and acquaintances were using drugs, adding, "I been around. I can tell." Juror Mullen said that she had never been personally affected by cocaine but that four or five of her social friends had abused cocaine for prolonged periods in the past.

[Petitioner]'s claim of jury misconduct is based upon a declaration of Juror Obayashi. In that declaration the juror said that during deliberations he had concerns about the effects of cocaine on a person and that other jurors offered information from past personal experiences with cocaine abuse. The trial court denied the motion for a new trial on this ground. The court said that perhaps there was a problem with the wording of the voir dire inquiry, but that some past usage of cocaine would not necessarily require a prospective juror to answer that he or she had a problem with cocaine abuse. The court said that in questioning the jurors it specifically did not want to ask whether they had ever used cocaine, and thus compel them to incriminate themselves, but rather sought more general information about cocaine abuse and its affect on their lives. The court also noted that the mere mention during deliberations of matters of common knowledge, such as the manner in which cocaine may affect a person, could not have influenced even a single juror.

People v. Anderson, slip op. at 40-41.

The state court of appeal rejected petitioner's claim as follows:

We agree with the trial court that Obayashi's declaration does not establish that any juror concealed information on voir dire. Any use of cocaine could constitute "abuse" to Obayashi, but the voir dire questioning did not require prospective jurors to disclose mere prior usage. And consistent with Obayashi's declaration, "past personal experiences" could mean personal observation of the effects of cocaine on others, but the voir dire questioning did not require prospective jurors to disclose such experiences. And Obayashi's declaration did not identify who offered information about the effects of cocaine, it simply said "other jurors." As we have noted, two of the jurors disclosed sufficient experience with

21

1     other persons who used cocaine to have been the source of that
information.  Obayashi's declaration provides too little information

2     upon which to base the speculative claim that members of the jury
intentionally concealed information during jury selection.

3

4          We also agree with the trial court's conclusion that the mention
by some jurors of the effects of cocaine does not warrant a new

5     trial.  In the trial court's words, "The suggestion here implicit in
Mr. Obayashi's declaration is that jurors may have said that

6     cocaine releases inhibitions or lowers inhibitions and people
behave differently when they are under the influence of cocaine.  I

7     can't see that as anything other than common knowledge.  You
don't have to use cocaine to know that in 1993."  In *People v.*

8     *Fauber* (1992) 2 Cal.4th 792, at pages 838 and 839, the Supreme
Court rejected a claim that a new trial was required because some

9     jurors related information about the effects of drugs.  The court
noted that jurors bring to their deliberations knowledge and beliefs

10    about general matters of law and fact that find their source in
everyday experience and that it is not possible to expect a jury to

11    be completely sterilized and freed from any external factors.  "To
say, for example, that the memory of some of the witnesses may

12    have been affected by drugs is to say no more than the common
knowledge that ingestion of drugs affects perception.  Jurors

13    cannot be expected to shed their backgrounds and experiences at
the door of the deliberation room.  Defendant does not persuade us

14    that any of the jurors' statements could adversely have affected the
verdict." (2 Cal.4th at p. 839.)  We find a similar result appropriate

15    here, particularly in light of the dearth of specific detail in the
Obayashi declaration.

16  <u>Id</u>. at 42-43.

17          The following principles of federal law are relevant to this claim:

18    To obtain a new trial on account of a juror's failure to disclose
information during voir dire, "a party must first demonstrate that a

19    juror failed to answer honestly a material question on voir dire, and
then further show that a correct response would have provided a

20    valid basis for a challenge for cause." <u>McDonough [Power Equip.,
Inc. v. Greenwood]</u>, 464 U.S. [548] at 556 [1984.  As we

21    explained in <u>Dyer</u>, it follows from <u>McDonough</u> that "an honest yet
mistaken answer to a voir dire question rarely amounts to a

22    constitutional violation; even an intentionally dishonest answer is
not fatal, so long as the falsehood does not bespeak a lack of

23    impartiality." <u>Dyer</u>, 151 F.3d at 973 (citing <u>McDonough</u>, 464 U.S.
at 555-56, 104 S.Ct. 845).

24

25  <u>Fields v. Brown</u>, 431 F.3d 1186, 1192 (9th Cir. 2005).  In addition,

26  /////

> [t]he Sixth Amendment inquiry in the context of outside influence on a jury is fact-specific. Among other things, it requires a reviewing court to determine whether the particular materials that a juror brought into the jury room are extraneous materials, or are merely "the kind of common knowledge which most jurors are presumed to possess." Rodriguez v. Marshall, 125 F.3d 739, 745 (9th Cir.1997), *overruled on other grounds by* Payton v. Woodford, 299 F.3d 815, 828-29 & n. 11 (9th Cir.2002) (en banc); *see also* Grotemeyer v. Hickman, 393 F.3d 871, 878-79 (9th Cir.2004) (stating that a juror's sharing her own experience as a physician with the jury is not extrinsic evidence); United States v. Bagnariol, 665 F.2d 877, 888 (9th Cir.1981) (discounting claim of prejudice where extraneous information was something "any reasonable juror already knew").

Fields v. Brown, 503 F.3d 755, 778-79 (9th Cir. 2007).

The Obayashi declaration reads in relevant part:

> I, SHIGERU L. OBAYASHI, declare:
>
> . . .
>
> 2.  That during the jury deliberations, I had concerns regarding the affects [sic] of cocaine on a person once he had consumed it. My concerns were addressed by other jurors, wherein they offered information from their past personal experiences with cocaine abuse.  [I couldn't resolve, in my mind, why Michael Rhinehart was left alive by the shooter.  I felt that the shooter was under the influence of cocaine, but couldn't justify his actions at the Schmeisser's apartment.]  Once I heard how cocaine affects a person, [I was able to rationalize that the shooter couldn't think clearly and he left Mr. Rhinehart alive].

Clerk's Transcript on Appeal (CT) at 643.[15]

As the state court of appeal found, "Obayashi's declaration did not identify who offered information about the effects of cocaine, it simply said 'other jurors.'"  People v. Anderson, slip op. at 42.  It "provides too little information upon which to base the speculative claim that members of the jury intentionally concealed information during jury selection."  Id.

---

[15]  The sections in brackets were stricken from the record by the state trial court pursuant to California Evidence Code § 1150.  See RT at 5121-22.  That section, like Fed. R. Evid. 606(b), precludes evidence of the mental processes of jurors.  See Estrada v. Scribner, 512 F.3d 1227, 1237 n.10 (9th Cir. 2008).

1    Nor is the declaration sufficient to suggest that the information offered by the "other jurors" went

2    beyond the scope of a juror's personal experience which may permissibly be brought to bear in

3    jury deliberations; such experiences may be discussed during deliberations as long as they do not

4    include "personal knowledge regarding the parties or the issues involved in the litigation that

5    may affect the verdict." U.S. v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991). The state

6    court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

7    established federal law. This claim should be denied.

8         Claim 4: Involuntary Statements and Lack of Waiver of Miranda Rights

9              Petitioner's fourth claim is that his rights under the Fifth and Sixth Amendments

10   were violated by the admission at trial of involuntary statements made by petitioner to police

11   after his arrest and without a valid waiver of his rights under Miranda v. Arizona, 384 U.S. 436

12   (1965). This claim was raised in and rejected by the state courts on petitioner's direct appeal.

13   Exs. C and D to Answer. The last reasoned rejection of this claim is the decision of the state

14   court of appeal, which set forth the facts relevant to this claim as follows:

15              After his arrest [petitioner] was interviewed by detectives from
          the city police department and the county sheriff's office. In the
16        interview [petitioner] did not confess to the crimes or otherwise
          admit participation in the shootings. In fact, he repeatedly denied
17        being involved. He did, however, make some statements that
          would later prove to have evidentiary value. For example, he
18        admitted visiting the homes of both murder victims during the
          afternoon, although not in the time span surrounding the killings.
19        He said that he had left some wire in Schmeisser's truck, which
          was consistent with Rhinehart's statement that Schmeisser asked
20        the killer about the wire in his truck. He admitted that he owned a
          .357 Smith and Wesson handgun. When asked about his
21        whereabouts at the approximate time of the killings, he said that he
          had gone to a Lumberjack store, stopped at a bank to make a
22        deposit but had not done so because he had no deposit slips with
          him, and had then cruised the interstate toward Galt before getting
23        in the accident. This would prove to be inconsistent with the alibi
          evidence offered at trial.[16]

24   _____

25        [16]  . . ., there was evidence that at the time of the murders [petitioner] had agreed to do a
     free lance electrical job for Betty Gipson, who lived in Wilton. Gipson testified that one the
26   afternoon of the murders, [petitioner] visited her home to pick up an advance payment and that

                                              24

1    Prior to trial [petitioner] moved to suppress his postarrest
     statements.  Part, but not all, of the interview was suppressed.
2

3    People v. Anderson, slip op. at 13-14.

4         A.  Involuntary Statements

5         Petitioner's first contention is that his post-arrest statements were involuntary

6    "due to a combination of factors which weakened his ability to withstand the pressures of

7    interrogation including the retrograde memory loss and other impairment caused by the

8    concussion petitioner suffered shortly before his arrest, the effects of cocaine intoxication and

9    withdrawal, the timing of the interrogation on the early morning hours when petitioner was

10   deprived of sleep, his physical pain and injuries, his emotionally distraught state and the officers'

11   interrogation tactics in taking advantage of these circumstances."  Traverse at 49.  This claim was

12   raised in and rejected by the state courts on petitioner's direct appeal.  Exs. C and D to Answer.

13   The last reasoned rejection of this claim is the decision of the state court of appeal, which

14   rejected it as follows:

15          [Petitioner] first asserts that his statements were involuntary in
        the traditional sense, that is, that they were the result of police
16      coercion.  In resolving this issue the basic question is whether
        influences brought to bear on the [petitioner] were such as to
17      overbear his will to resist and bring about a statement that was not
        freely self-determined.  (People v. Kelly (1990) 51 Cal.3d 931,
18      952.)  Conduct of the police that may be considered coercive will
        result in suppression where it is the proximate or motivating cause
19      of the defendant's statements.  (Id. at pp. 952-953; see also People
        v. Benson (1990) 52 Cal.3d 754, 778-779.)  In determining whether
20      the defendant's will was overborne, we must consider all of the
        surrounding circumstances, including the characteristics of the
21      defendant and the details of the interrogation.  (People v.
        Thompson, supra, 50 Cal.3d at p. 166.)
22   /////

23

24   she though he had arrived between 5 and 5:30 p.m.  In his trial testimony [petitioner] said that he
     was at Gipson's house around 5 p.m. on the day of the murders.  However, in his statements after
25   his arrest [petitioner] described various things he had been doing at the time of the murders, such
     as going to Lumberjack, going to the bank, and cruising the interstate, but he did not claim to
26   have been at Gipson's house.

[Petitioner] was not youthful, uneducated, or mentally deficient. At the time of the murders he was 29 years old, said that he had attended college for three years studying business finance and traffic safety, and the transcripts of the police interview as well as his testimony at the suppression hearing reveals a reasonably intelligent and articulate person.  Both the transcript of the interview and [petitioner]'s testimony at the suppression hearing reflect a person who is not particularly susceptible, and is in fact quite resistant, to official coercion.  This may be highlighted by instances at the suppression hearing in which he successfully refused to answer questions put to him by the prosecutor.[17]  It is against this background that we must consider [petitioner]'s specific assertions of coercion.

[Petitioner] first asserts that he had been injured in the car accident but that in complete disregard for basic human decency the officers did not take him for treatment until after the interview. The fact that an arrestee suffered injury and may have been in some pain during an interview does not automatically require suppression of his statements. (*In re Walker* (1974) 10 Cal.3d 764, 777.)  [Petitioner] had suffered some injuries in the accident, including a bump on the head and one or more cuts on his lip and chin.  However, the interrogating officers testified that [petitioner] was offered medical assistance but that he refused it.  He said he was in a little bit of pain but was all right.  The transcript of the interview reflects that [petitioner] was asked about his injuries and gave answers such as:  "I feel a little banged up, but I've got most of my (inaudible)"; and "It hurts, but it ain't like, you know."  In light of the whole record, this factor does not compel suppression of the interview.

[Petitioner] next asserts that he was probably suffering from cocaine withdrawal.  Evidence that officers took advantage of an addict's withdrawal symptoms would be a factor indicating that a statement was not free and voluntary. (See *People v. Terry* (1974) 38 Cal.App.3d 432, 438.)  However, here there was no evidence that [petitioner] was suffering from withdrawal symptoms.  He admitted he was a cocaine user, and said he had taken cocaine earlier in the day.  But despite specific questioning he refused to say that the grip of the drug influenced his action.  And during his testimony at the suppression hearing he did not claim that his

---

[17]   At one point in the cross-examination, the prosecutor asked [petitioner] whether he was at the home of Howard Wackman before his arrest and [petitioner] refused to answer.  His counsel then successfully objected as beyond the scope of direct examination.  The prosecutor asked whether [petitioner] had looked in a mirror (at his injuries) before getting to the sheriff's office and, when [petitioner] refused to answer, asked the court to direct [petitioner] to answer. The court told [petitioner] to answer the question but he still refused.  On the prosecutor's motion to strike [petitioner]'s direct testimony defense counsel asserted that the question was beyond the scope of the direct examination, and the court agreed and denied the motion to strike.

1    participation in the interview was influenced by either his earlier
     use of cocaine or the effect of his habit.  This alleged factor does
2    not support suppression of the interview.

3        [Petitioner] asserts that since the interview took place after 2
     a.m., it may be inferred that he needed sleep.  However, on this
4    record whether [petitioner] may have needed sleep and the possible
     effect that may have had on his free will is entirely speculative.
5    [Petitioner] asserts that he was in shock at the news of his two
     friends' deaths.  But nothing in the transcript of the interview or
6    the suppression hearing indicates that the officers somehow took
     advantage of that fact through implied threats or promises in order
7    to obtain [petitioner]'s participation in the interview.  [Petitioner]
     asserts that he sat alone for a long time before the interview began.
8    In fact, the record indicates that [petitioner] was alone in the
     interview room for approximately 22 minutes, which cannot be
9    considered a lengthy period of time under the circumstances.
     Neither that time period nor the length of the interview can be
10   considered inherently coercive.  (See *People v. Maestas* (1987) 194
     Cal.App.3d 1499, 1505.)  [Petitioner] claims that when he
11   eventually invoked his right to an attorney the officers ignored it.
     In fact, the interview was suppressed from the point at which
12   [petitioner] said he wanted an attorney, and this subsequent
     conduct of the officers logically could not have coerced
13   [petitioner]'s earlier decision to participate in the interview.
     [Footnote omitted.]
14
         [Petitioner] asserts that the officers told him they knew he was
15   guilty and lied to him about the strength of the evidence.  The
     officers told [petitioner] they knew he committed the shootings,
16   which under the circumstances was not at all unreasonable.  They
     also told [petitioner] they had an eyewitness to the Schmeisser
17   shooting, which was true.  Eventually they said that they had an
     "eyeball" witness to the Nick shooting, who saw [petitioner] go
18   into the house, shoot Nick for no reason, and leave in his car.  That
     statement was false to the extent it claimed that the witness
19   actually saw the shooting.  However, numerous decisions confirm
     that deception does not compel suppression.  (*People v. Thompson*,
20   *supra*, 50 Cal.3d at p. 167; *In re Walker*, *supra*, 10 Cal.3d at p.
     777; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124.)  Deception
21   may be a factor when coupled with improper promises or threats.
     (*People v. Thompson*, *supra*, 50 Cal.3d at p. 167; *People v. Hogan*
22   (1982) 31 Cal.3d 815, 840-841.)  But that did not occur here.

23       When considered in the light of the totality of the
     circumstances, we find that none of the factors asserted by
24   [petitioner] singly or together establish that his participation in the
     interview was coerced and we reject his contention that his
25   statements were involuntary in the traditional sense.

26   People v. Anderson, slip op. at 14-19.

                                27

Petitioner contends that the state appellate court's factual findings underlying its rejection of this claim are unreasonable because the court (1) did not watch the videotape of petitioner's interrogation; (2) placed the burden of proving involuntariness on petitioner; and (3) failed to address the totality of the circumstances. Petitioner also contends that the findings were unreasonable in light of the evidence concerning the circumstances attendant to the interrogation.

> The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. *See also* Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Fifth Amendment protects against involuntary statements obtained by state coercion. *See, e.g.,* Rogers v. Richmond, 365 U.S. 534, 540-41, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Voluntariness is considered in light of the totality of the circumstances. *See, e.g.,* Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Specifically, we consider whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir.1988). *See also* Hutto v. Ross, 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (per curiam).

Beaty v. Stewart, 303 F.3d 975, 992 (9th Cir. 2002). "A statement is involuntary if it is 'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" U.S. v. Leon Guerrero, 847 F.2d at 1366 (quoting Hutto v. Ross, 429 U.S. at 30 (internal quotation omitted)). In determining whether a defendant's statements were voluntary the court looks at the totality of circumstances. See Doody v. Schriro, 548 F.3d 847, 858 (9th Cir. 2008) (quoting Dickerson v. U.S., 530 U.S. 428, 434 (2000) and Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). "The assessment of the totality of the circumstances may include consideration of the length and location of the interrogation; evaluation of the maturity, education, physical and mental condition of the defendant; and determination of whether the defendant was properly advised of his Miranda rights." Doody, at 859 (citing Withrow v. Williams, 507 U.S. 680, 693-94 (1993)).

/////

This court has reviewed the videotape of petitioner's interrogation by Officers Lee and Edwards, which occurred in the early morning hours of August 25, 1990 following petitioner's arrest. The videotape shows petitioner sitting by himself with his right arm handcuffed to a table for approximately 22 minutes and 30 seconds. At the end of that time, an officer entered the room and released petitioner from the handcuffs. Petitioner stood for a few minutes, then sat down again. He was by himself for a few more minutes before the officers returned and the interrogation began.[18] He remained free of handcuffs during the interrogation, which lasted approximately forty-five minutes.

At the start of the interrogation, the officers asked petitioner if he felt "okay, with the exception of that cut on you [sic] lip?" CT at 382. Petitioner replied that he felt "a little banged up" but that he had "most of his senses."[19] The officers inquired about additional injuries, and petitioner indicated he had a "pretty hefty knot" on his head and that "under my chin's busted too." On the videotape, petitioner appears lucid and not in any medical distress, although he occasionally blows his nose and appears to check his lip for blood. In its June 5, 1998 order denying petitioner's December 6, 1994 petition for writ of habeas corpus, the Sacramento County Superior Court described the videotaped interrogation as follows:

> The petitioner can be observed on the tape for at least one hour. The tape shows him before, during, and after the interview. There are no indications of drowsiness, pain or incoherence. There is nothing that suggests he is under the influence of a drug or suffering from withdrawal from a drug. He displays no difficulty understanding the questions asked of him. He responds to questions in a normal and appropriate manner.

/////

/////

---

[18]  The initial part of the interrogation is not audible on the videotape.

[19]  The transcript of the interrogation, which is in the Clerk's Transcript starting at page 381, sets forth petitioner's response as follows: "I feel a little banged up, but I've got most of my (inaudible)." CT at 382. This court's review of the videotape suggests that petitioner said "I feel a little banged up, but I've got most of my senses."

Ex. F to Mar. 2, 2000 Answer, at 19.  After reviewing the videotape, this court finds the superior court's description to be an accurate characterization of the interrogation.[20]

While acknowledging that the state court of appeal considered numerous factors in resolving this claim, petitioner contends that the court "disregarded entirely the 'normal' coercive circumstances attending the custodial interrogation" including the fact that petitioner was "held in isolation, handcuffed, in a small interrogation room and subjected to questioning about the murder of his two friends," that he was "left isolated and handcuffed in a tiny room for 22 minutes . . . with blood dripping down his face (which the videotape shows petitioner repeatedly wiping with his shackled hands) at 2:00 a.m. after being knocked unconscious for probably an hour," and that petitioner was obviously in a sleep-deprived state.  Traverse at 53-55. Petitioner overstates the circumstances revealed by the videotape of the interrogation.  The videotape does not suggest that the interrogation room was "tiny" or that blood was "dripping down [petitioner's] face."  Moreover, the videotape shows that only one of petitioner's hands was shackled during the 22 minute period that preceded the interrogation and that both hands were free during the questioning.  Finally, while it does appear that petitioner was either sleepy or bored while waiting for the officers, he did not exhibit signs of drowsiness during the interrogation.

After review of the entire record and consideration of all of the circumstances surrounding petitioner's custodial interrogation, this court finds no evidence that the statements petitioner made to officers during that interrogation were involuntary.  The state court's rejection of this claim was neither contrary to nor an unreasonable application of relevant principles of federal law, nor was its decision based on an unreasonable determination of the facts.  This aspect of petitioner's fourth claim for relief should be denied.

---

[20]  Prior to the start of the interrogation, petitioner did put his head down on the table and appeared either drowsy or bored during part of the time he was waiting by himself.  The court agrees, however, that during the interrogation petitioner gave no sign of drowsiness or incoherence or pain beyond what he described to the officers.

B. <u>Validity of Miranda Waiver</u>

Petitioner's second contention is that the statements he made to police were obtained in violation of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1955) because he did not waive his <u>Miranda</u> rights at the time of the interrogation.  This claim was raised in and rejected by the state courts on petitioner's direct appeal.  Exs. C and D to Answer.  The last reasoned rejection of this claim is the decision of the state court of appeal, which rejected the claim as follows:

> [Petitioner] contends that the prosecution failed to establish that he validly waived his *Miranda* rights.  He first argues that the evidence does not establish that he comprehended his rights and that was waiving them.  The transcript of the interview reflects that [petitioner] was advised of his rights and asked whether he understood them.  He answered that he did understand each of his rights.  His own testimony at the suppression hearing establishes that he in fact understood his rights and what it meant to waive them. . . .

> [Petitioner] argues that the evidence does not show that he actually waived his *Miranda* rights.  The transcript of the interview reflects that after [petitioner] was advised of his rights and said that he understood them, the following exchange occurred:

> "IO  [Investigating Officers]:  I wish to talk to you about the murder of two people.  Okay?  And having these rights in mind do you wish to answer some questions about the murder of two people?

> "AA:  [Arthur Anderson]:  Is my girlfriend all right?

> "IO:  She's fine.

> "AA:  Okay.

> "IO:  She's fine.  But we want to talk to you about the murder of a couple of people that you know.

> "AA:  Okay.

> "IO:  Do you understand these rights that I've read to you?

> "AA:  Yes sir.

> "IO:  Do you wish to waive them and . .

1        "AA:  No sir, I want to know.

2        "IO:  You want to talk to us then?

3        "AA:  Yeah.

4        "IO:  Okay.

5        "AA:  Yeah, let's . .

6        "IO:  Okay.

7        "AA:  Who do I know that's murdered?"

8        No particular words are necessary, or necessarily enough, to
find an invocation by a suspect of his *Miranda* rights.  It is often
9 relatively easy to find appellate decisions in which similar
statements have been held both to be and not to be an invocation of
10 rights. . . .

11        In the circumstances presented [petitioner]'s statement "No sir,
I want to know" in connection with asking about his girlfriend was
12 ambiguous and the officers were entitled to continue talking to him
to determine whether he was waiving or invoking his rights.
13 (*People v. Johnson*, *supra*, 6 Cal.4th at p. 27; see also *People v.
Crittenden* (1994) 9 Cal.4th 83, 129-130; *People v. Clark*, *supra*, 5
14 Cal.4th at pp. 990-991.)  [Petitioner] affirmed that he waived his
rights and he then initiated the discussion of the murders.  We
15 conclude that under all of the circumstances presented, the trial
court's refusal to suppress the initial portion of the interview was a
16 correct decision under the facts and the law.

17 People v. Anderson, slip op. at 19-22.

18        "Before a defendant's self-incriminating statements may be admitted into

19 evidence, 'a heavy burden rests on the government to demonstrate that the defendant knowingly

20 and intelligently waived his privilege against self-incrimination and his right to retained or

21 appointed counsel.'"  U.S. v. Rodriguez, 518 F.3d 1072, 1076 (9th Cir. 2008) (quoting Miranda,

22 384 U.S. at 475.)  "Prior to obtaining an unambiguous and unequivocal waiver, a duty rests with

23 the interrogating officer to clarify any ambiguity before beginning general interrogation."  U.S. v.

24 Rodriguez, 518 F.3d at 1080.  However, not "all waivers of Miranda rights must be *express*:  'a

25 suspect may impliedly waive the rights by answering an officer's questions after receiving

26 /////

1  Miranda warnings.'" Id. (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127,

2  amended, 416 F.3d 939 (9th Cir. 2005).)

3          Petitioner contends that his statement "No sir I want to know" in response to the

4  officer's question about whether he wished to waive his rights was an invocation of those rights,

5  not a waiver, and that the state court's finding of waiver was an unreasonable determination of

6  the facts. Petitioner also contends that the officer's follow-up question, "You want to talk to us

7  then?", did not result in a clarification but instead "reinforced petitioner's belief that he could

8  still refuse to waive his rights and still seek information from the officers about his girlfriend's

9  welfare." Traverse at 60-61.

10         As noted above, the court has reviewed the videotape of petitioner's interrogation,

11 including the exchange described in the preceding paragraph. The state court's determination

12 that petitioner's statement "No sir I want to know" was ambiguous is completely supported by

13 the videotape. Moreover, the officer clarified that petitioner wished to continue talking to them,

14 and petitioner's decision to continue answering questions after the exchange was, at a minimum,

15 an implied waiver of his Miranda rights. The state court's rejection of this claim was neither

16 contrary to nor an unreasonable application of relevant principles of federal law, nor was its

17 decision based on an unreasonable determination of the facts. This aspect of petitioner's fourth

18 claim for relief should be denied.

19     Claim 7: Refusal to Instruct on the Effect of Intoxication on Mental States Required for

20 First Degree Murder

21         Petitioner claims that his rights to due process, to present a defense, and to a fair

22 trial were violated by the trial court's denial of defense counsel's request to instruct the jury with

23 CALJIC 4.21 concerning the effect of voluntary intoxication on the specific intent required for

24 murder. This claim was raised in and rejected by the state courts on petitioner's direct appeal.

25 Exs. C and D to Answer. The last reasoned state court rejection of petitioner's due process claim

26 /////

is the decision of the state court of appeal on petitioner's direct appeal, which rejected the claim

as follows:

> Jury instructions on voluntary intoxication and its relationship to specific intent must be given upon request when there is evidence supportive of such a theory. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) However, such instructions may properly be refused when there is no evidence from which a jury could conclude that as a result of voluntary intoxication the defendant failed to form the requisite criminal intent or attain the requisite mental state. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1181; *People v. Williams* (1988) 45 Cal.3d 1268, 1311.) The mere fact that there is some evidence of ingestion of intoxicants before the crime is not itself sufficient to require instructions on voluntary intoxication.
>
> The sole evidence [petitioner] relies upon in support of this contention is the fact that during his interview with detectives after his arrest he said that he had used cocaine earlier in the day. At trial he was equivocal about whether he had used cocaine, and he made no claim of having been intoxicated or otherwise under the influence of the drug by the time of the murders. And none of the witnesses to the murders or who otherwise saw [petitioner] during that time described him as intoxicated. On this record the claim that [petitioner] may have been so under the influence of cocaine that he did not harbor the mental states requisite to his convictions is nothing but rank speculation.

People v. Anderson, slip op. at 55-56.[21]

As a general rule, federal habeas corpus relief is only available for an alleged error

in jury instructions when the instructional error "'so infected the entire trial that the resulting

---

[21] Respondents contend that petitioner has failed to exhaust his claims that the alleged instructional error violated his rights to present a defense, by failing to raise that claim at all in the state courts, and to a fair trial, by raising that claim for the first time in a petition for review filed in the California Supreme Court. See Answer to Amended Petition, filed Aug. 3, 2004, at 75. Respondent also contends that these claims are procedurally defaulted because they are now time-barred under California law. See id. Petitioner contends that respondents have waived the procedural default defense by not raising it in response to his original petition, which included all of these federal claims, and that he exhausted his claim of violation of the right to present a defense in his second petition for review to the California Supreme Court. Petitioner also contends that "any violation of the right to present a defense instruction necessarily entails a denial of due process *and* a denial of a fair trial" and that alleged violation of his right to present a defense was exhausted with the latter claims. Traverse at 62-65. Petitioner exhausted his claims of violations of his right to due process and to a fair trial on direct appeal when he included them in his petition for review to the California Supreme Court. The right to present a defense is included in the requirements of due process, see Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006), and that claim is exhausted.

1   conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116

2   L.Ed.2d 385 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d

3   368 (1973)).  A habeas petitioner has an "especially heavy" burden "[w]here the alleged error is

4   the failure to give an instruction.  Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir.1992)

5   (quoting Henderson v. Kibbe, 431 U.S. 145, 155, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)).

6   
7   
8   
9   
10  
11  
12  
13  
14  
15  
16  
> Due process requires that criminal prosecutions "comport with
> prevailing notions of fundamental fairness" and that "criminal
> defendants be afforded a meaningful opportunity to present a
> complete defense." [California v.] Trombetta, 467 U.S. [479] at
> 485, 104 S.Ct. 2528 [(1984)]. When habeas is sought under 28
> U.S.C. § 2254, "[f]ailure to instruct on the defense theory of the
> case is reversible error if the theory is legally sound and evidence
> in the case makes it applicable." Beardslee v. Woodford, 358 F.3d
> 560, 577 (9th Cir.2004) (as amended); see also Bradley v. Duncan,
> 315 F.3d 1091, 1098 (9th Cir.2002) ("[T]he right to present a
> defense would be empty if it did not entail the further right to an
> instruction that allowed the jury to consider the defense.") (internal
> quotation marks omitted); Conde v. Henry, 198 F.3d 734, 739 (9th
> Cir.2000) (as amended) ("It is well established that a criminal
> defendant is entitled to adequate instructions on the defense theory
> of the case."). A habeas petitioner must show that the alleged
> instructional error "had substantial and injurious effect or influence
> in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S.
> 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citation
> omitted); see also Beardslee, 358 F.3d at 578.

17  Clark v. Brown, 450 F.3d 989, 904-905 (9th Cir. 2006).  See also Byrd v. Lewis, 566 F.3d 855,

18  860 (9th Cir. 2009).

19           During his interview with the police following his arrest, petitioner told the

20  officers that he had "shot up" about three quarters of a gram of cocaine at around one or two in

21  the afternoon.  CT at 385-86.  After he injected the cocaine, he went to Nick's house.  Id. at 386.

22  He stayed there for about ten minutes, got another quarter of a gram of cocaine, left and went to

23  get some gas, and then went home and shot up the additional quarter of a gram.  Id. at 386-389.

24  He told the officers he had never used that much cocaine before in that short a period of time, but

25  that he had "been working up to it."  Id. at 390.  When asked if the questioning officer was right

26  that petitioner couldn't "remember much after [he] shot up the second time," petitioner

1  responded "Yes sir." Id. at 391.  A videotape of this interview was played to the jury at trial, and

2  a transcript of this interview was admitted into evidence as People's Exhibit 25-A.  See Ex. B to

3  Mar. 2, 2000 Answer, at 95 n.58, and citations to the record therein.

4          After review of the record, this court finds that the state court of appeal's

5  determination that there was insufficient evidence to support the requested instruction is

6  supported by the record.  In particular, the state court's finding that "[a]t trial [petitioner] was

7  equivocal about whether he had used cocaine, and he made no claim of having been intoxicated

8  or otherwise under the influence of the drug by the time of the murders" is fully supported  by the

9  record and an accurate characterization thereof.  The state court's rejection of this claim was

10  entirely congruent with controlling principles of federal law.  This claim should be denied.

11          Claim 8:  Failure to Instruct Sua Sponte on Lesser Included Offenses

12          Petitioner's eighth claim is that his right to due process was violated by the trial

13  court's failure to instruct the jury sua sponte on the lesser included offenses of voluntary and

14  involuntary manslaughter and to give related instructions.  See Amended Petition at 41.  This

15  claim was raised in and rejected by the state courts on petitioner's direct appeal.  Exs. C and D to

16  Answer.  The last reasoned rejection of this claim is the decision of the state court of appeal on

17  petitioner's direct appeal, which rejected the claim as follows:

18          A trial court must instruct on lesser included offenses when there is
            evidence from which a jury composed of reasonable persons could
19          conclude that the defendant was guilty of the lesser crime.  (*People
            v. Wickersham* (1982) 32 Cal.3d 307, 325.)  But such instructions
20          need not be given where the evidence establishes that if the
            defendant is guilty at all, he is guilty of the greater offense.  (*Ibid*.)
21          [Petitioner]'s only claim with respect to voluntary and involuntary
            manslaughter is that his voluntary intoxication may have precluded
22          him from harboring the mental states consistent with first or
            second degree murder.  We have rejected [petitioner]'s contention
23          that the trial court erred in refusing his request for instructions on
            voluntary intoxication; perforce we reject the claim that the court
24          had a duty to instruct sua sponte on these lesser included offenses.

25  People v. Anderson, slip op. at 57.

26  /////

36

1      In a capital case, due process requires instruction on lesser included offenses when

2 such instructions are warranted by the evidence.  See Beck v. Alabama, 447 U.S. 625, 638 &

3 n.14 (1980); Hopper v. Evans, 456 U.S. 605, 611 (1982).[22]  "California law is essentially the

4 same with respect to any sort of criminal offense: it requires a trial judge to instruct a jury on all

5 lesser included offenses when the evidence raises a question as to whether all of the elements of

6 the charged offenses were presented, but not when there is no evidence the offense was less than

7 that charged. People v. Sedeno, 10 Cal.3d 703, 715, 112 Cal.Rptr. 1, 9, 518 P.2d 913, 921

8 (1974), disapproved on other grounds, People v. Flannel, 25 Cal.3d 668, 684 n. 12, 160

9 Cal.Rptr. 84, 93 n. 12, 603 P.2d 1, 10 n. 12 (1980); People v. Saldana, 157 Cal.App.3d 443, 454,

10 204 Cal.Rptr. 465, 471 (1984)."  Miller v. Stagner, 768 F.2d 1090, 1091 (9th Cir. 1985).

11      Here, as in the state court, petitioner argues that evidence that he was "voluntarily

12 intoxicated as a result of two intravenous injunctions of more cocaine than he had ever used

13 before" could have led reasonable jurors to conclude that he lacked the specific intent required

14 for murder and to convict him instead of manslaughter.  Amended Petition at 41.  For the reasons

15 set forth supra, petitioner was not entitled to a jury instruction on voluntary intoxication; a

16 fortiori, there was no due process violation in the state court's failure to instruct sua sponte on

17 lesser included offenses.  The state court's rejection of this claim was neither contrary to nor an

18 unreasonable application of controlling principles of federal law, nor was it based on an

19 unreasonable determination of the fact.  This claim should be denied.

20      Claim 11:  Excusing Juror Rondone Without Good Cause

21      By claim 11, petitioner contends that his Sixth Amendment right to an impartial

22 jury was violated when the trial court excused juror Victoria Rondone from the jury shortly

23 before the prosecution finished its case-in-chief.  Petitioner contends that juror Rondone was

24 _____

25      [22]  For non-capital cases, "[f]ailure of a state court to instruct on a lesser offense fails to
present a federal constitutional question and will not be considered in a federal habeas corpus
proceeding."  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir.1984).  The instant case was tried as

26 a capital case, although petitioner was ultimately sentenced to life in prison.

excused without good cause.  This claim was raised in and rejected by the state courts on

petitioner's direct appeal.  Exs. C and D to Answer.  The last reasoned rejection of this claim is

the decision of the state court of appeal, which set forth the relevant facts as follows:

> On the morning of December 15, 1992, Juror Rondone absented
> herself from the trial.  About 10 minutes after the trial was
> scheduled to have resumed, the court received a telephone call
> from a person who identified himself as Rondone's husband.  The
> caller said that Rondone's grandmother had died and that Rondone
> had left to drive her mother to Reno, and that she expected to be
> back to resume her jury service the following day.  After hearing
> from the parties, the court determined to excuse Rondone and
> replace her with an alternate juror.

People v. Anderson, slip op. at 60-61.  The state court of appeal found that the trial court had

acted "well within its discretion" in deciding to excuse Juror Rondone, particularly in light of the

death in her family "and her unilateral decision to absent herself from the proceedings."  Id. at

61.

California Penal Code § 1089 provides:

> If at any time, whether before or after the final submission of the
> case to the jury, a juror dies or becomes ill, or upon other good
> cause shown to the court is found to be unable to perform his duty,
> or if a juror requests a discharge and good cause appears therefor,
> the court may order him to be discharged and draw the name of an
> alternate, who shall then take his place in the jury box, and be
> subject to the same rules and regulations as though he had been
> selected as one of the original jurors.

Cal. Penal Code §1089 (quoted in Perez v. Marshall, 119 F.3d 1422, 1426 (9th Cir. 1997).  The

United States Court of Appeals for the Ninth Circuit has "upheld the constitutionality of section

1089 under the Sixth Amendment."  Perez, at 1426 (citing Miller v. Stagner, 757 F.2d 988, 995

(9th Cir., amended, 768 F.2d 1090 (1985)).

The question of whether petitioner's Sixth Amendment right to a jury trial was

violated by the trial court's decision to excuse Juror Rondone and replace her with an alternate

"is a a is a question of law which we review de novo."  Perez, at 1426.  In this habeas corpus

/////

38

1  action, the "trial court's findings regarding juror fitness are entitled to special deference." Id.

2  This court reviews for "manifest error" the trial court's decision to excuse Juror Rondone. Id.

3         The trial court found good cause to excuse Juror Rondone based on (1) the court's

4  inability to proceed with trial due to her absence; (2) the court's concern about her being

5  distracted; and (3) the fact that she had been late on a couple of other occasions. RT at 2817.

6  The court also considered the fact that it had four alternate jurors available to replace Juror

7  Rondone, and that the trial was ahead of schedule. Id. at 2818. Those findings are entitled to

8  "special deference." Perez, at 1426.

9         After review of the entire record herein, this court finds no "manifest error" in the

10  trial court's decision to dismiss Juror Rondone. The state courts' rejection of petitioner's Sixth

11  Amendment claim arising from the trial court's decision to excuse Juror Rondone was neither

12  contrary to, nor an unreasonable application of controlling principles of federal law. This claim

13  should therefore be denied.

14         Claim 12: Insufficient Evidence of Lying in Wait

15         By claim 12, petitioner contends that there was insufficient evidence to support

16  either murder conviction under a theory of lying in wait. This claim was raised in and rejected by

17  the state courts on petitioner's direct appeal. Exs. C and D to Answer. The last reasoned

18  rejection of this claim is the decision of the state court of appeal, as follows:

19         [Petitioner] contends that the evidence was insufficient to
          support findings of lying in wait with the respect to the murders of
20         Nick and Schmeisser, and that instructions on this theory were
          unwarranted. We disagree. Lying in wait requires that the murder
21         be committed under circumstances which include (1) a
          concealment of purpose, (2) a substantial period of watching and
22         waiting for an opportune time to act, and (3) immediately
          thereafter, a surprise attack on an unsuspecting victim from a
23         position of advantage. . . ." (People v. Morales (1989) 48 Cal.3d
          527, 557; see also People v. Hardy, supra, 2 Cal.4th at p. 163.)

24

25         In People v. Hardy, supra, the killers disabled a porch light and
          used a key and bolt cutters to enter a house in which their victims
26         slept. The Supreme Court said: "Thus cloaked in darkness, they
          traversed the hallway to the bedrooms and killed the victims. From

this evidence, the jury could reasonably conclude defendants concealed their murderous intention and struck from a position of surprise and advantage, factors which are the hallmark of a murder by lying in wait.  Insisting on a showing that defendants actually watched the victims sleeping and waited a moment before attacking reads the law in too literal a fashion."  (2 Cal.4th at p. 164.)  In *People v. Ruiz*, *supra*, 44 Cal.3d at page 615, the court found sufficient evidence of lying in wait where the victims were both shot in the head from close range and their bodies were found buried in the yard clothed in bedclothes and wrapped in bedding.  In *People v. McDermand* (1984) 162 Cal.App.3d 770, 773, the evidence was sufficient where the defendant killed the victims while they slept.  As these decisions demonstrate, the period of watching and waiting need not be long; it is sufficient that the defendant concealed his purpose until he had an opportunity to launch a surprise attack from a position of advantage.

"A reviewing court may not substitute its judgment for that of the jury.  It must view the record favorably to the judgment below to determine whether there is evidence to *support* the instruction, not scour the record in search of evidence suggesting a contrary view."  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1143, emphasis in original.)

We find ample evidence to support the instruction in this case.  The eyewitness to the Schmeisser murder testified that [petitioner] entered the apartment on the subterfuge of a friendly visit, carrying something in which he had apparently concealed his gun.  When the victim was completely off guard and unaware of [petitioner]'s murderous purpose, [petitioner] held the gun to his face and shot him.  This is strong evidence that [petitioner] concealed his purpose while he sought a position of advantage from which to shoot Schmeisser in a surprise attack (*People v. Ceja*, *supra*, 4 Cal.4th at p. 1144) and is sufficient evidence of lying in wait under *People v. Hardy*, *supra*, 2 Cal.4th at page 164, and *People v. Ruiz*, *supra*, 44 Cal.3d at page 615.

Although there was no eyewitness to the Nick murder itself, under all of the circumstances the jury could reasonably infer that [petitioner] employed a modus operandi similar to the Schmeisser murder.  In addition, Michael Cole, who was leaving Nick's home as [petitioner] arrived, saw [petitioner] carrying a flat box toward Nick's door and it is reasonably inferable that [petitioner] had his gun concealed in the box.  Moreover, Nick was found on his couch, shot in the head, and the evidence indicated that he was sitting or lying on the couch when he was shot.  This evidence reasonably supports a finding that [petitioner] sought and waited for a position of advantage from which to murder Nick.

/////

/////

1               Accordingly, we find sufficient evidence to support lying-in-wait
2               instructions in this case.

3  People v. Anderson, slip op. at 64-67.

4        When a challenge is brought alleging insufficient evidence, federal habeas corpus

5  relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

6  more favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond

7  a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson, the court

8  must review the entire record when the sufficiency of the evidence is challenged on habeas.

9  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d

10  722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to 'resolve

11  conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

12  facts to ultimate facts."  Jackson, 443 U.S. 307, 319.  "The question is not whether we are

13  personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the

14  conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

15  Under Jackson, the federal habeas court determines sufficiency of the evidence in reference to the

16  substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. 307, 324

17  n.16.

18        After review of the record herein, this court finds that the state court of appeal's

19  determination that there was sufficient evidence to support a finding of lying in wait as to each of

20  the murders was neither contrary to or an unreasonably application of clearly established federal

21  law, nor based on an unreasonable determination of the facts in the record.  This claim should be

22  denied.

23      Claim 13:  Due Process Violation in Use of the Term "Lying in Wait"

24        Petitioner's thirteenth claim is that his conviction under a lying in wait theory of

25  murder violates his rights to due process and a fair trial because "the redefinition of the elements

26  of offense by the state courts results in arbitrary application of Penal Code § 189 and because the

statute, as interpreted by the California courts, is vague and overbroad."  Amended Petition at 48.

This claim was raised in and rejected by the state courts on petitioner's direct appeal.  Exs. C and

D to Answer.  The last reasoned rejection of this claim is the decision of the state court of appeal,

which rejected the claim as follows:

> [Petitioner] argues that lying in wait, as interpreted by the California Supreme Court, is unconstitutional.  As we have noted, we are bound by the decisions of our Supreme Court.  (*Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d 450.)  Assuming that, despite *Auto Equity Sales, Inc.,* we may consider whether our Supreme Court's interpretation of a statute is unconstitutional, we reject [petitioner]'s argument here.

> [Petitioner] first argues that lying in wait, as a basis for finding murder to be in the first degree, constitutes an impermissible presumption of premeditation and deliberation.  We disagree.  This argument presupposes that the Legislature may classify only premeditated and deliberated killings as first degree murder.  We find no authority for such a proposition.  Defining crimes is a matter within the legislative prerogative.  (*People v. Dillon* (1983) 34 Cal.3d 441, 462-463.)  The Legislature obviously found murder perpetrated by lying in wait to be sufficiently heinous to warrant punishment in the same manner as premeditated and deliberated murder.  (Pen. Code, § 189.)  But the Legislature did not provide that lying in wait gives rise to a presumption of premeditation and deliberation; rather, under our law a showing of lying in wait obviates the need to prove premeditation and deliberation.  (*People v. Hardy* (1992) 2 Cal.4th 86, 162-163.)  This does not constitute a constitutionally impermissible presumption.  (*Ibid.*)

> [Petitioner] contends that "lying in wait" is unconstitutionally vague and overbroad.  Our Supreme Court has rejected an identical contention with respect to lying in wait as a special circumstance in a murder case.  (*People v. Edwards*, *supra*, 54 Cal.3d at p. 824.)  We find the reasoning of the decision in *Edwards* to be dispositive here as well.

People v. Anderson, slip op. at 63-64.

It is "indisputable . . . that the authority to define and fix the punishment for crime

is legislative. . . ."  Ex parte U.S., 242 U.S. 27, 42 (1916).  The authority to define crimes under

California law rests with the voters of the State of California and the California legislature, which

have defined first degree murder as follows:

/////

> All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, [enumerated felonies], or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.

Cal. Penal Code § 189.  According to the United States Court of Appeals for the Ninth Circuit, "lying in wait originated in California as a means of presuming the premeditation necessary for a finding of first degree murder."  Webster v. Woodford, 369 F.3d 1062, 1074 (9th Cir. 2004) (citing Domino v. Superior Court, 129 Cal.App.3d 1000 (1982)).  This "means of presuming" necessary premeditation is not an unconstitutional presumption that eliminates the requirement of proof of an essential element of murder.  Cf. Sandstrom v. Montana, 442 U.S. 510 (1979).  Rather, it permits proof of "three elements:  concealment, watching, and waiting" as one way to show the mens rea necessary for first degree murder as defined by California law.  Webster, at 1073.

Nor is the definition of lying in wait murder unconstitutionally vague or overbroad.  "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  Kolender v. Lawson, 461 U.S. 352, 357 (1983).  California's prohibition on lying in wait murder satisfies this constitutional requirement.  The state court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  This claim should be denied.

Claims 5, 19, 20, 21, 23D and F, 24, and 26:  Ineffective Assistance of Counsel

Petitioner raises several claims of ineffective assistance of counsel.  A claim of ineffective assistance of counsel has two elements, both of which must be shown by the

petitioner in order to prevail on the claim.  First, the petitioner must show that, considering all

the circumstances, counsel's performance fell below an objective standard of reasonableness.

Strickland v. Washington, 466 U.S. 688 (1984).  The court must determine whether in light of all

the circumstances, the identified acts or omissions were outside the wide range of professional

competent assistance.  Id. at 690.  "Review of counsel's performance is highly deferential and

there is a strong presumption that counsel's conduct fell within the wide range of reasonable

representation."  United States v. Ferreira-Alameda, 815 F.2d 1251 (9th Cir. 1986).

Second, the petitioner must prove prejudice.  Strickland at 693.  To demonstrate

prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

The focus of the prejudice analysis is on "whether counsel's deficient performance renders the

result of the trial unreliable or the proceeding fundamentally unfair."  Lockhart v. Fretwell, 506

U.S. 364, 372 (1993).

Claims 5 and 19:  Failure to Investigate and Present Evidence of Petitioner's Head

Injury and Intoxication in Support of Motion to Suppress Evidence

By claims 5 and 19, petitioner claims that trial counsel was ineffective in failing to

present in connection with the motion to suppress petitioner's statements to police testimony

from the forensic psychiatrist, Dr. Albert Globus,  who conducted a neurological examination of

petitioner and testified for the defense at trial.  Petitioner presented this claim to the state courts

in petitions for writ of habeas corpus filed in the Sacramento County Superior Court and the

California Court of Appeal for the Third Appellate District and in a Petition for Review to the

California Supreme Court.  See Exs. A, G and H to Answer.  The last reasoned rejection of the

claim is the June 5, 1998 decision of the state superior court, which rejected the claim as follows:

It is correct that the trial counsel did not offer the medical
testimony of Dr. Globus at this stage of the proceedings.
Regarding the failure to present evidence of cocaine intoxication at

[the hearing on the admissibility of petitioner's statements to police], this court assumes petitioner is referring to the failure to have his blood sample properly tested early in time, which may have resulted in evidence of cocaine in the blood of the petitioner some hours after his arrest.  The court will agree that trial counsel was very likely ineffective in failing to have the blood tested early in time.  This ineffectiveness may have resulted in the loss of the evidence in question.  The court will agree that it is possible trial counsel was ineffective in not presenting Dr. Globus' testimony at the hearing on voluntariness.  These are tentative observations, at this point in time.

It is the view of this court that it is not necessary to reach any conclusion on the above questions concerning possible ineffectiveness of trial counsel.  The petitioner has the burden of establishing both the ineffective ness of counsel and that the ineffective performance of counsel resulted in prejudice to the petitioner.  Petitioner must establish that there is a reasonable probability that the result would have been more favorable to the petitioner in the absence of counsel's ineffective assistance.  (Strickland v. Washington (1984) 466 U.S. 668.)  In order to suppress the statement, petitioner would have to demonstrate that his reasoning was in fact so impaired that he was incapable of free or rational choice.  (People v. Mayfield (1993) 5 Cal.4th 142, 204.)  For example, the fact a defendant made a statement while under the influence of a drug or suffering from drug withdrawal does not necessarily render it involuntary.  The same is true of the claimed head injury.  The totality of the circumstances must be examined to determine whether the statement was the product of a rational intellect and a free will.  (People v. Hernandez (1998) 204 Cal.App.3d 639, 648.)

If the trial counsel had presented the testimony of Dr. Globus at the suppression hearing and also presented evidence confirming petitioner's use of cocaine some 10 hours before the statement, he would have had little prospect of changing the outcome of the suppression motion.  First, during the statement itself, the petitioner reported he was not still being affected by the cocaine.  It is a matter of common knowledge that cocaine is a fast acting drug which does not have long lasting effects on the individual.  During his statement, the petitioner also reported that he was not suffering in any significant manner from the head injury.

Second, the testimony of the petitioner at the suppression hearing needs to be considered.  In his testimony, he did not claim that he was somehow befuddled or impaired by his head injury at the time he was being interviewed.  Finally, this court has observed the entire video tape of the interview which was received in evidence at the trial.  The petitioner can be observed on the tape for at least one hour.  The tape shows him before, during, and after the interview.  There are no indications of drowsiness, pain or

1       incoherence.  There is nothing that suggests he is under the
        influence of a drug or suffering from withdrawal from a drug.  He
2       displays no difficulty understanding the questions asked of him.
        He respond to questions in a normal and appropriate manner.
3       Petitioner points to nothing on the video tape or in the transcript of
        the questioning that supports the claim that his reasoning was
4       significantly impaired during the statement.  Based upon the above
        considerations, this court concludes that there is no reasonable
5       probability that the evidence petitioner contends should have been
        presented would have caused a more favorable ruling by the trial
6       court.

7 In re Arthur R. Anderson, slip op. at 17-19.

8          After review of the entire record, this court finds that the state superior court's

9 findings are supported by the record.[23]  This court finds no reasonable probability that the

10 outcome of the hearing on the suppression motion  would have been different had petitioner's

11 trial counsel offered the testimony of Dr. Globus at the suppression hearing or had the blood

12 sample tested for the presence of cocaine at a much earlier time.  The state court's rejection of

13 this claim is neither contrary to nor an unreasonable application of clearly established principles

14 of federal law.  This claim should be denied.

15          Claim 20:  Failure to Raise Involuntariness

16          Petitioner next claims that his counsel was ineffective in failing to contend in the

17 motion to suppress that petitioner's statements to police were involuntary and to support that

18 contention with evidence of cocaine intoxication and medical evidence of the effects of

19 petitioner's head injury and cocaine abuse.  For the reasons discussed in Claim 4, supra,

20 petitioner's statements to police were not involuntary and were not obtained in violation of his

21 rights under Miranda.  A fortiori, counsel's performance in this regard was not ineffective.  This

22 claim should be denied.

23 /////

24

25      [23]  As noted in this court's discussion of Claim 4, supra, this court did see in the videotape
   some suggestion that petitioner was drowsy or bored while waiting to be questioned by police
26 officers.

1          Claim 21:  <u>Failure to Investigate and Present Evidence of Juror Moon's Sleeping</u>

2    <u>During Trial</u>

3          In claim 21, petitioner contends that he received constitutionally ineffective

4    assistance of counsel when his trial counsel failed "to adequately investigate and present

5    evidence that Juror Bruce Moon fell asleep for minutes at a time, several times each day

6    throughout the trial, and thereby missed cumulatively significant portions of trial testimony, and

7    that Mr. Moon suffered from an undiagnosed disorder that caused him to slip into a sleep state

8    when in sedentary situations" in connection with petitioner's motion for a new trial.  Amended

9    Petition at 52, 58-59.  Petitioner presented this claim to the state courts in petitions for writ of

10   habeas corpus filed in the Sacramento County Superior Court and the California Court of Appeal

11   for the Third Appellate District and in a Petition for Review to the California Supreme Court, <u>see</u>

12   Exs. A, G and H to Answer, and in a petition for writ of habeas corpus filed in the California

13   Supreme Court on January 14, 2003 and denied by that court on September 10, 2003.  The last

14   reasoned rejection of the claim is the June 5, 1998 decision of the state superior court, which

15   rejected the claim as follows:

16           The petitioner's second claim of ineffective assistance of
         counsel relates to the hearing on trial counsel's motion for a new
17       trial.  One of the issues raised was the claim that juror Moon had
         been asleep during portions of the testimony.  The affidavits of
18       three jurors were filed in which they reported that Mr. Moon had
         admitted he had trouble staying awake and had fallen asleep during
19       some testimony.  The only witness who testified at the hearing was
         juror Moon.  He denied falling asleep, although he acknowledged
20       that his eyes were closed at times.  He acknowledged he had low
         blood pressure and that he did have problems staying awake.
21       Petitioner alleges trial counsel should have presented the testimony
         of other jurors at the hearing.  He also alleges that trial counsel
22       should have obtained Moon's medical records to support the report
         he was sleeping and to show that juror Moon committed
23       misconduct by not disclosing his condition during voir dire.

24           The court finds there is no reasonable probability that these
         alleged failures of trial counsel resulted in prejudice to the
25       petitioner.  Regarding the failure to call other jurors, it is clear that
         the trial judge had read and considered the affidavits of the three
26       jurors.  The trial record shows that the affidavits have been

underlined in parts, and various words have been circled by the judge.  It is apparent the judge was fully aware of the contents of these affidavits.  With the contents of the affidavits well known to the judge, he accepted the explanation given during the hearing by juror Moon.  The judge accepted his assertion that he had not fallen asleep.  It is not likely hearing other jurors testify to the contents of their affidavits would cause a different outcome.  Since juror Moon admitted to having a medical condition that did have some effect on his ability to stay awake, it appears unlikely that medical records would add to that admission.  Since the trial judge was persuaded that juror Moon was able to stay awake during the trial testimony, it is an extremely remote possibility that the trial judge would have found juror misconduct based on the juror's failure to disclose his condition during voir dire.  If a juror is able to stay awake trough [sic] an extended trial, it is not likely his condition is of sufficient severity to warrant disclosure during voir dire.

In re Arthur R. Anderson, slip op. at 19-21.

Several principles of clearly established federal law are relevant to disposition of this claim.  First, Rule 606(b) of the Federal Rules of Evidence sets forth limitations on the admission of juror testimony, as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b).  In Tanner v. United States, 483 U.S. 107, 121 (1987), the United States Supreme Court held that Rule 606(b) is "grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences."  As the United States Court of Appeals for the Ninth Circuit explained,

"[t]he near-universal and firmly established common law rule in the United States flatly prohibited the admission of juror testimony to impeach a verdict." Tanner v. United States, 483 U.S. 107, 107

48

S.Ct. 2739, 2745, 97 L.Ed.2d 90 (1987); McDonald v. Pless, 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). Exceptions were made only where it was alleged that an "extraneous influence" affected the jury; courts nearly always refused to admit juror testimony concerning internal abnormalities absent a contemporaneous adjudication or an extremely strong showing of juror incompetence. Tanner, 107 S.Ct. 2746-47; see Mattox v. United States, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (exception for situations involving extraneous influence); United States v. Pimentel, 654 F.2d 538, 542 (9th Cir.1981) (juror testimony admissible only concerning facts bearing on extraneous influence on deliberations).

Hard v. Burlington Northern R. Co., 870 F.2d 1454, 1460-61 (9th Cir. 1989). With the possible exception of "'substantial if not wholly conclusive evidence of incompetency,'" Tanner, at 125 (quoting U.S. v. Dioguardi, 492 F.2d 70, 80 (C.A.N.Y. 1974), "allegations of the physical or mental incompetence of a juror" are treated as internal, rather than external, influences on jury deliberations and are not subject to post-verdict inquiry. Tanner, at 118. Moreover, "[w]hether the juror was literally inside or outside the jury room when the irregularity occurred has no bearing on the determination that a particular influence was external or internal." U.S. v. Hernandez-Escarsega, 886 F.2d 1560, 1579 (9th cir. 1989) (citing Tanner, at 117). In Tanner, the Court held that allegations by a juror that he and three other jurors consumed alcohol without becoming intoxicated and that "some jurors were 'falling asleep all the time during trial,' and that his own reasoning ability was affected on one day of the trial" were insufficient to come within "the common-law exception allowing post-verdict inquiry when an extremely strong showing of incompetency has been made" Id. at 126.

In accordance with the principles discussed in the preceding paragraphs, any testimonial or other evidence from any of the trial jurors, including Mr. Moon, concerning his alleged sleeping during portions of the trial are not admissible in these proceedings. See Fed. R. Evid. 606(b); see also Tanner, at 117-126. Petitioner has also presented non-juror evidence of Mr. Moon's sleeping, including declarations from petitioner's mother, petitioner's two sisters, and two friends of petitioner's family, all of whom averred that they observed Mr. Moon appear

49

to fall asleep during portions of the trial.  In addition, petitioner has presented an expert

declaration from David Claman, M.D. concerning whether Mr. Moon suffered from a sleep

disorder and the probable impact of such a disorder "on his ability to perceive trial testimony."

Ex. 5 to 2003 State Supreme Court Habeas Petition.  Dr. Claman's declaration is based

substantially, though not entirely, on juror affidavits, testimony and interviews.  Id.  It is also

based on the nonjuror declarations filed by petitioner in this action.  Id.

Section 1150(a) of the California Evidence Code "is substantively similar to Fed.

R. Evid. 606(b)."  Estrada v. Scribner, 512 F.3d at 1237 n.10.  Petitioner claims that his trial

counsel was ineffective in failing to discover and present in support of his motion for new trial

additional evidence that petitioner has now tendered in support of the relevant claims raised in

the instant petition.  To the extent that evidence is testimony or other evidence from jurors,

including Juror Moon, it is not admissible in these proceedings and would not have been

admissible before the state court.  Counsel was therefore not ineffective in failing to discover or

present additional evidence from the jurors.

Moreover, the nonjuror evidence presented by petitioner is insufficient to

demonstrate that his constitutional rights were violated by Juror's Moon's sleep behaviors during

trial.  As noted above, the United States Supreme Court held in Tanner that evidence that "some

jurors were 'falling asleep all the time during trial'" did not establish juror incompetence

sufficient to justify further post-verdict inquiry.  Tanner at 126.  The admissible evidence

presented to this court shows no more than that deemed insufficient by the Tanner Court.  For

that reason, this court finds no reasonable probability that the outcome of the motion for new trial

would have been different had petitioner's counsel pursued the evidence presented herein and

that petitioner suffered no cognizable prejudice as a result of counsel's omission.  The state

court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

established United States Supreme Court precedent.  This claim should be denied.

/////

1          Claim 23 D and F:  Failure to Preserve Issues for Appeal

2                  Petitioner claims that his trial counsel was ineffective in failing to preserve two

3     issues concerning jury instructions for appeal.  Specifically, petitioner claims his counsel was

4     ineffective in failing to request a jury instruction on the causal element of lying in wait murder

5     and in failing to request a jury instruction on lesser included offenses.  As discussed above,

6     petitioner has also claimed that the jury instruction on lying in wait murder was erroneous and

7     that the trial court erred in not instructing the jury on lesser included offenses.  For the reasons

8     discussed supra, neither claim has merit.  A fortiori, counsel was not ineffective in failing to

9     request the instructions suggested by petitioner.  This claim for relief should be denied.

10         Claim 24:  Failure to Test Blood

11                 By claim 24, petitioner claims that his counsel was ineffective in failing to

12    promptly obtain a test of petitioner's blood sample to confirm the presence of cocaine.  Petitioner

13    presented this claim to the state courts in petitions for writ of habeas corpus filed in the

14    Sacramento County Superior Court and the California Court of Appeal for the Third Appellate

15    District and in a Petition for Review to the California Supreme Court.  See Exs. A, G and H to

16    Answer.  The last reasoned rejection of the claim is the June 5, 1998 decision of the state

17    superior court, which rejected the claim as follows:

18              The petitioner's fifth claim of ineffective assistance of counsel
        relates to counsel's failure to obtain promptly a confirmatory blood
19      test establishing the presence of cocaine in petitioner's blood
        sample taken by police some 10 hours after the criminal conduct at
20      issue.  An initial evaluation of the blood sample came back
        presumptively positive for cocaine.  back negative.  [sic]  Petitioner
21      contends that cocaine in the blood breaks down over time and an
        early test would probably have been positive.  Petitioner asserts
22      that the failure to confirm cocaine in petitioner's blood damaged
        petitioner's entire strategy and deprived him of the crucial defense
23      of voluntary intoxication.  (The court has already addressed this
        issue as it relates to the hearing on the motion to suppress
24      petitioner's statement.)

25              Petitioner has offered the declaration of a qualified toxicologist
        in his supplemental declarations.  This expert confirms that cocaine

26    /////

51

1    in the blood will decompose and disappear over a period of time,
     such as existed in this case.  (Exh. M.)

2
        The court agrees that counsel was likely ineffective for not
3    promptly obtaining a testing of the blood.  The court will assume
     that counsel's delay caused the loss of this evidence which might
4    have confirmed the [petitioner]'s initial claim that he injected the
     drug within a few hours of the criminal conduct.  However, trial
5    counsel in his declaration indicates that he may have delayed
     testing in the hope that no cocaine would appear in his blood.
6    Since his recall at this time of his trial strategy is not clear, he does
     not assert this to be a fact.  This does raise an interesting issue of
7    trial strategy.  It may not have been in petitioner's best interest to
     emphasize and argue that petitioner was under the influence of
8    cocaine on the afternoon in question.  Being under the influence of
     cocaine may provide an explanation for the bizarre and seemingly
9    pointless murders of two friends of petitioner.  Such an argument
     could weaken the argument that someone other than his
10   [petitioner] did commit the murders.

11       Assuming for the sake of this discussion that this was not a trial
     strategy to down play the cocaine evidence, the court will consider
12   whether the loss of this evidence was prejudicial to the [petitioner]
     at trial.  First, it appears unlikely the trial court would have given
13   the instruction on voluntary intoxication, even with the
     confirmatory blood test.  If the instruction was given, it appears
14   unlikely trial counsel could have effectively utilized the defense.
     At trial, the petitioner made no claim he was intoxicated or
15   otherwise under the influence of the drug by the time of day at
     which the murders occurred.  None of the witnesses to the murders
16   described him as intoxicated.  None of the persons who saw him
     near in time to the murders observed any indication of intoxication.
17   Evidence which established his ingestion of cocaine at some time
     on the date of the crime would hardly support the contention that
18   he was so affected by cocaine that he did not form the mental state
     required for murder.  This blood evidence would have little value
19   in the face of petitioner's repeated assertions he was not affected
     by the drug.  The court concludes that the presence of a
20   confirmatory blood test showing evidence of cocaine usage would
     not have the probability of a more favorable result for the
21   [petitioner].

22   In re Arthur R. Anderson, slip op. at 26-28.

23       After review of the entire record, this court finds that the state superior court's

24   findings are fully supported by the record.  This court finds no reasonable probability that the

25   outcome of the trial would have been different had petitioner's trial counsel had the blood sample

26   tested for the presence of cocaine at a much earlier time.  The state court's rejection of this claim

                                    52

1   is neither contrary to nor an unreasonable application of clearly established principles of federal

2   law.  This claim should be denied.

3                          Claim 26:   Failure to Request and Object to Jury Instructions

4                    By claim 26, petitioner contends that his trial counsel was ineffective in failing to

5   request lesser included offense instructions on manslaughter and involuntary manslaughter, to

6   adequately support his belated request for a jury instruction on voluntary intoxication to negate

7   specific intent, failure to request a jury instruction that instructed the jury it could disregard "an

8   admission that is insufficiently corroborated or otherwise unworthy of belief," failure to request

9   an instruction informing the jury it could "consider psychological factors affecting the

10  believability of a defendant's statement to police," failure to request an instruction on the "by

11  means of" element of lying in wait murder, failure to request a limiting instruction on the use of

12  consciousness of guilt evidence, failure to request an instruction on prior consistent or

13  inconsistent statements of trial witnesses, failure to request lesser included and lesser related

14  instructions on attempted murder, and failure to object to the omission of the "by means of"

15  element of lying in wait murder from the jury instruction that was given.  See Amended Petition

16  at 69-75; Traverse at 152-162.

17                   Petitioner presented this claim to the state courts in petitions for writ of habeas

18  corpus filed in the Sacramento County Superior Court and the California Court of Appeal for the

19  Third Appellate District and in a Petition for Review to the California Supreme Court.  See Exs.

20  A, G and H to Answer.  The last reasoned rejection of the claim is the June 5, 1998 decision of

21  the state superior court, which rejected the challenges on a variety of grounds.  See In re Arthur

22  Anderson, slip op. at 26, 29-37.  Several of the omitted jury instructions have been the subject of

23  other claims in this petition, which the court has found to be without merit.  See Claims 2, 7 and

24  8, supra.  Counsel was not ineffective for failing to request, or to support a request for, the jury

25  instructions addressed in the discussion of those claims.  With respect to the remaining

26  instructions, this court finds that petitioner has failed to show prejudice from counsel's failure to

1  request any of the identified instructions.  The superior court's decision is neither contrary to nor

2  an unreasonable application of clearly established federal law.  This claim should be denied.

3        Claim 25:  <u>Youngblood Violation</u>

4            By claim 25, petitioner contends that his due process rights were violated when

5  the prosecution failed to timely request a further analysis of petitioner's blood for intoxicating

6  substances after a presumptive test indicated the presence of cocaine in a sample of petitioner's

7  blood taken the day after the crimes.  Petitioner presented this claim to the state courts in

8  petitions for writ of habeas corpus filed in the Sacramento County Superior Court and the

9  California Court of Appeal for the Third Appellate District and in a Petition for Review to the

10 California Supreme Court.  <u>See</u> Exs. A, G and H to Answer.  The last reasoned rejection of the

11 claim is the June 5, 1998 decision of the state superior court, which rejected the claim on the

12 grounds that petitioner had "failed to make a prima facie showing of 'bad faith' by the

13 prosecution," had "failed to establish that the prosecution was responsible for the alleged loss of

14 the evidence," and that "[t]he prosecution did not lose or destroy the evidence."  Ex. H to Mar. 2,

15 2000 Answer, <u>In re Arthur R. Anderson</u>, No. 94F09998, slip op. at 28-29.

16           It is a violation of a criminal defendant's right to due process when law

17 enforcement agencies fail to preserve evidence that "possess[es] an exculpatory value that was

18 apparent before the evidence was destroyed and [is] of such a nature that the defendant would be

19 unable to obtain comparable evidence by other reasonably attainable means." <u>California v.</u>

20 <u>Trombetta</u>, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Unless a criminal

21 defendant can show bad faith on the part of law enforcement, however, "failure to preserve

22 potentially useful evidence does not constitute a denial of due process." <u>Arizona v. Youngblood</u>,

23 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).  "The presence or absence of bad faith

24 by [law enforcement] for purposes of the Due Process Clause must necessarily turn on the

25 police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."

26 <u>Id</u>. at 56 n.*.

1       At trial, the parties stipulated that a blood sample was taken from petitioner

2  between 3:00 and 4:30 a.m. on August 25, 1990.  RT at 3406.  On August 27, 1990, Debra

3  Henry, a criminalist at the Sacramento County Crime Lab did a "presumptive screen called a

4  radioimmunoassay" on the blood sample, which came back positive for cocaine.  Id. at 3396-97.

5  No further tests were requested at that time.  Id.  Ms. Henry performed a "confirmatory test" on

6  the sample about a week and a half before she testified at trial[24] and "was unable to confirm the

7  presence of cocaine."  Id. at 3398.  In August 1990, when Ms. Henry performed the presumptive

8  screen, the Sacramento County Crime Lab did not perform confirmatory tests for cocaine.  Id. at

9  3399.  If such a test had been requested, she would have sent it to a lab in the Sacramento or

10  Oakland area.  Id.

11       A portion of the sample was provided to petitioner's defense.  Id. at 3408.  On

12  April 10, 1991, that portion was tested by Nancy Enkema, a toxicologist at Valley Toxicology in

13  West Sacramento.  Id. at 3421-22.  She did a "basic screen for major drugs of abuse" and "ran a

14  radioimmunoassay for the cocaine metabolite."  Id. at 3422.  The result of that radioimmunoassay

15  test was negative.  Id.

16       Petitioner contends that the prosecution violated his right to due process by

17  "permitting the blood sample to deteriorate until no trace of cocaine remained before conducting

18  a confirmatory test for cocaine in the presence of the sample" and by "falsely assuring defense

19  counsel it would conduct a prompt confirmatory test to determine the presence of drugs in the

20  sample."  Amended Petition, at 67.  The latter contention is predicated on a statement in the

21  declaration of Donald Moonshine, an attorney who assisted petitioner's counsel on direct appeal.

22  See Declaration of Donald Moonshine, attached as Exhibit A to Petition for Writ of Habeas

23  Corpus filed in the Sacramento County Superior Court, a copy of which is attached as Exhibit A

24  to Mar. 2, 2000 Answer (hereafter Moonshine Declaration).  In his declaration, Mr. Moonshine

25

26      [24] Ms. Henry testified on December 30, 1992.  CT at 474.

1  avers that "[i]n a letter dated October 1, 1990 from Mr. Masuda [petitioner's trial counsel] to

2  prosecutor Christopher Cleland, Mr. Masuda summarized a discussion he had had with Mr.

3  Cleland.  Mr. Cleland had informed Mr. Masuda he would have the blood analyzed for cocaine,

4  alcohol, methamphetamines, barbiturates and ampicillin.  Mr. Masuda had told Mr. Cleland he

5  also wanted his own experts to analyze the blood and would make such a request in the 'near

6  future.'"  Moonshine Declaration, at ¶ 11.  The declaration does not indicate when the

7  conversation memorialized in the October 1, 1990 letter took place, nor is a copy of the letter

8  appended to the declaration.

9          Appended as Exhibit C to petitioner's state superior court habeas corpus

10  petition is a report from the Sacramento County Office of the District Attorney,

11  Laboratory of Forensic Services, dated October 19, 1990, and signed by Debra Henry.

12  The report reflects that on August 27, 1990, two samples of petitioner's blood were

13  removed "from the evidence locker at the Sheriff's Sobriety testing station" and that a

14  toxicology examination was performed, the results of which are reported as follows:

15          A presumptive test indicates the presence of cocaine, however,
        cocaine is not being confirmed in blood by the laboratory at this
16          time.  Amphetamines, opiates, and barbiturates were not detected
        in the blood sample.

17

18  Ex. C to Ex. A to Mar. 2, 2000 Answer.[25]

19          While the court is unable to determine when the conversation between Mr.

20  Masuda and Mr. Cleland referred to in Mr. Moonshine's declaration took place, the record is

21  clear that petitioner's blood was tested on August 27, 1990 for amphetamines, barbiturates and

22  opiates, with negative results, and that a test for alcohol was also negative.  No further testing for

23  those substances would have been warranted.  The written report of the drug toxicology results is

24  dated October 19, 1990, eighteen days after the date of the alleged letter from petitioner's counsel

25  _____

26      [25]  At trial, Ms. Henry confirmed that another report indicated that no alcohol had been
detected in the blood sample; it is not clear when the blood was tested for alcohol.  RT at 3405.

1  to the prosecutor.  Thus, regardless of when the conversation between Mr. Masuda and Mr.

2  Cleland occurred, there was no false representation by the prosecutor concerning further testing

3  for those substances.  Moreover, the Moonshine Declaration does not indicate that the prosecutor

4  promised to do confirmatory testing for cocaine; it indicates only that the prosecutor told Mr.

5  Masuda that petitioner's blood would be analyzed for cocaine.  Petitioner's blood was analyzed

6  for cocaine.  There is no evidence to support petitioner's contention that the prosecution "falsely

7  assur[ed] defense counsel it would conduct a prompt confirmatory test" for cocaine.  Amended

8  Petition at 67.

9          Petitioner's contention that his due process rights were violated when the

10  prosecution "allowed" the sample to deteriorate without performing a confirmatory test is

11  similarly without merit.  The prosecution had no legal obligation to perform a confirmatory test

12  for cocaine, see Mitchell v. Goldsmith, 878 F.2d 319, 322 (9th Cir. 1989) (citing Youngblood at

13  338), and the prosecution provided a sample of petitioner's blood to his defense counsel when

14  counsel made the request.[26]

15          For all of the foregoing reasons, the state court's rejection of petitioner's

16  Youngblood claim was neither contrary to nor an unreasonable application of clearly established

17  federal law, nor was it based on an unreasonable determination of the facts.  This claim should be

18  denied.

19          Claim 27:  Denial of Due Process, Fair Trial and Right to Jury Trial Because of Sleeping

20  Juror

21          Petitioner's final claim is that his rights to due process, a fair trial, and to a jury

22  trial of twelve competent jurors were violated because one of the jurors slept through material

23

24       [26]  Moreover, contrary to petitioner's assertion, the record does not support the conclusion

25  that the positive result of the radioimmunoassay gave rise to knowledge that petitioner's blood
    sample contained exculpatory evidence of cocaine intoxication.  Debra Henry testified that
    "presumptive tests are not specific" and may be positive for a number of reasons other than the

26  actual presence of cocaine in the blood.  E.g., RT at 3409.

parts of the trial testimony.  For the reasons set forth in the discussion of Claim 21, <u>supra</u>, this claim is without merit.  It should be denied.

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 10, 2009.


UNITED STATES MAGISTRATE JUDGE

12
ande1086.157

58